# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Martin v. Keeley & Sons, Inc.*, 2011 IL App (5th) 100117

---

| | |
|---|---|
| Appellate Court Caption | TERRY MARTIN, ARDITH WYNN, and RICKEY VANOVER, Plaintiffs-Appellants, v. KEELY & SONS, INC., Defendant-Appellee, and EGYPTIAN CONCRETE COMPANY and ALLEN HENDERSON & ASSOCIATES, INC., Defendants-Appellants. |
| District & No. | Fifth District<br>Docket No. 5-10-0117 |
| Filed | September 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries plaintiffs suffered when an I-beam on a bridge they were constructing collapsed and fell, the trial court erred in entering summary judgment for plaintiffs' employers on the spoliation of evidence claims made by plaintiffs, the fabricator of the I-beam and the designer of the beam, since a genuine issue of material fact existed as to whether a reasonable person should have foreseen that the I-beam was material to a potential civil action based on the incident. |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 02-L-357; the Hon. Michael J. O'Malley, Judge, presiding. |
| Judgment | Reversed and remanded. |

| | |
|---|---|
| Counsel on Appeal | Mark C. Scoggins and Anthony P. Gilbreth, both of Crowder & Scoggins, Ltd., of Columbia, for appellants Terry Martin, Rickey Vanover, and Ardith Wynn. |
| | Charles L. Joley and Kenneth M. Nussbaumer, both of Donovan, Rose, Nester & Joley, P.C., of Belleville, for appellant Egyptian Concrete Company. |
| | John L. McMullin and T. Michael Ward, both of Brown & James, P.C., of St. Louis, Missouri, for appellant Allen Henderson & Associates, Inc. |
| | Dayna L. Johnson and Russell K. Scott, both of Greensfelder, Hemker & Gale, P.C., of Swansea, Thomas Q. Keefe, Jr., of Thomas Q. Keefe, Jr., P.C., of Belleville, and Victor H. Essen II and Debbie S. Champion, both of Rynearson, Suess, Schnurbusch & Champion, L.L.C., of St. Louis, Missouri, for appellee Keeley & Sons, Inc. |
| | Devon C. Bruce, of Power Rogers & Smith, P.C., and Matthew S. Sims, of Steven J. Morton & Associates, both of Chicago, for *amicus curiae* Illinois Trial Lawyers Association. |
| Panel | JUSTICE WEXSTTEN delivered the judgment of the court, with opinion. Presiding Justice Chapman concurred in the judgment and opinion. Justice Spomer dissented, with opinion. |

**OPINION**

¶ 1 The circuit court of St. Clair County entered summary judgment in favor of the appellee on the appellants' spoliation-of-evidence claims. For the reasons that follow, we reverse and remand for further proceedings.

¶ 2 BACKGROUND

¶ 3 On May 29, 2001, while installing a handrail on a bridge that defendant Keeley & Sons, Inc. (Keeley), was reconstructing pursuant to a contract with the Illinois Department of Transportation (IDOT), the plaintiffs, Terry Martin, Ardith Wynn, and Rickey Vanover, were

injured when they fell from scaffolding supported by an I-beam that collapsed and fell into Maxwell Creek near Sparta. The I-beam was manufactured by defendant Egyptian Concrete Company (Egyptian) and was supported by a bearing assembly designed by defendant Allen Henderson & Associates, Inc. (Henderson). On May 30, 2001, after the accident was investigated by both IDOT and the Occupational Safety and Health Administration (OSHA), Keeley broke the concrete portion of the I-beam into riprap and retrieved the steel plates from the beam so that Egyptian could manufacture a replacement.

¶ 4    The plaintiffs subsequently filed a multicount complaint against the defendants alleging, *inter alia*, that Egyptian had negligently manufactured the I-beam, that Henderson had negligently designed the bearing assembly that had supported the beam, and that Keeley had breached its duty to preserve the beam by destroying it. Egyptian and Henderson later filed counterclaims against Keeley also alleging that it had breached its duty to preserve the I-beam. Motions and cross-motions for summary judgment on the appellants' spoliation-of-evidence claims followed. The following evidence was adduced via discovery depositions.

¶ 5    Wynn testified that when he fell from the Maxwell Creek bridge, he was installing a safety handrail on a decked part of the bridge that was supported by three precast beams. The decking and handrail were made of wood and the beam that collapsed was "on the north side of the highway." Wynn testified that before falling from the bridge, he heard a "crack or a pop sound." Lying injured near the creek with pieces of lumber around him, Wynn observed the beam "lying on its side" and "broken in the center." Wynn testified that he had no idea what caused the beam "to break or to roll," and he did not know "which happened first." Wynn acknowledged that he had not "heard of any criticisms of the beam."

¶ 6    Vanover, also a carpenter by trade, testified that he was standing on the decked overhang of the Maxwell Creek bridge helping install the handrail when he "heard something pop." He then stood up and felt himself falling. Vanover had "no idea what happened," but he "landed in the creek in the riprap."

¶ 7    Martin testified that as a general laborer, he was helping install the handrail on the decked portion of the bridge when "[a]ll of a sudden[,] there was a loud pop[,] and the bridge just collapsed." Martin indicated that he had to be dug out from underneath a pile of broken decking before he was transported to the hospital. Martin assumed that the I-beam in question had broken, because when he woke up in the creek, the beam was "raised" and "busted right dead in the middle." He acknowledged, however, that no one had ever told him that there might have been "problems with the actual beam."

¶ 8    Keeley's president, Eugene Keeley, testified that he had been with the company for 24 years, and Keeley was the general contractor at the Maxwell Creek bridge site. Eugene testified that Shawn Neuf was the construction superintendent at the site, and Rich Lehmann was the engineer. Eugene testified that after the I-beam's collapse, Neuf had called him and told him that the beam had "failed." When he and Lehmann inspected the I-beam approximately an hour later, however, they concluded that the collapse was "clearly a roll-over situation," as evidenced by the way the beam was lying in the creek and by "the way the form fell off." Eugene stated that the I-beam was on its side in the creek and had "failed right in the middle," probably when "it got parallel." He indicated that if the beam had actually

broken, it would have fallen "straight down in a 'V' formation." He further indicated that any defects in the I-beam itself would have been noted and "pursued." Eugene testified that after inspecting the I-beam and the work site, he and Lehmann had concluded that the beam had rolled under undue stress resulting from the use of an elastomeric bearing assembly on the east abutment of the bridge. Eugene indicated that the elastomeric bearing assembly had "diminished the capacity of the overhang and was the cause of the beam rotating off the abutment under what was a normal forming procedure for this type of structure." Eugene testified that elastomeric bearing assemblies are "typically used with steel girders," and he "had not seen them used with concrete prestressed I-beams" before. Eugene indicated that the I-beam would not have rolled had it been supported with "a tie-back system" or weighted down with "dead load." While he and Lehmann were conducting the work-site inspection, Eugene "took a bunch of pictures." Neuf and "the resident engineer for IDOT on the project" were also present during the inspection. Eugene testified that the replacement beam that Keeley later obtained from Egyptian was properly tied back and "went up just fine."

¶ 9        On May 30, 2001, after meeting an OSHA official, who also inspected the beam, Keeley broke the beam up with a jackhammer, removed the beam's steel ends, and left the remaining pieces as riprap in the creek. Eugene testified that three factors influenced the decision to destroy the beam rather than preserve it. First of all, when Eugene spoke with Mike Hammond at Egyptian about manufacturing a replacement beam, Hammond had advised him that by reusing the steel ends, a new beam would be available sooner. Secondly, Jerry Wibbenmeyer at IDOT had expressed concerns that if left in the creek, the beam might cause bridge scouring. Lastly, since neither IDOT nor OSHA had expressed "any criticisms of the beam," and because the cause of the accident had been identified, disposing of the beam was just "a matter of cleaning up the mess." Eugene stated that he believed that Keeley had "satisfied all of [its] obligations to [IDOT] and to OSHA," and "it was just kind of a move-on-from-there situation." Eugene testified that after inspecting the work site, he had not thought about potential lawsuits stemming from the accident, although Keeley had been sued before. He assumed that his injured workers would receive workers' compensation benefits, however, regardless of the accident's cause. Eugene indicated that no one who had investigated the accident had a "different theory" as to its cause. Eugene acknowledged that Keeley could have brought in equipment to move the I-beam "to the side" and that Keeley could have removed the beam's steel ends with a concrete saw.

¶ 10        Lehmann testified that he was a licensed engineer and had worked as a civil engineer for over 25 years. Stating that there "was no question" regarding the "integrity" of the collapsed I-beam, Lehmann testified that he had not carefully inspected the beam before its destruction because he did not suspect that it had caused the accident. Lehmann indicated that based on his calculations, the beam had simply rolled over when too many workers were standing on it. He further stated that the collapse could have been avoided if the beam had been tied down. Stating that an elastomeric bearing pad used to support one of the beam's ends had "reduced the area of bearing" on that end, Lehmann suggested that the bearing pad had caused a loss of stability that had resulted in the beam's "tipping." Lehmann indicated that the beam was approximately 50 feet long and 3 feet "deep." Lehmann testified that Keeley had never had "any stability problems in the past," and no one had ever suggested that the

I-beam had broken. Lehmann acknowledged, however, that improper handling of a concrete beam can significantly weaken the beam and even cause it to "explode" under stress. Lehmann acknowledged that the I-beam could have been removed from the creek and preserved.

¶ 11    Neuf testified that Steve Gard, the carpenter foreman at the Maxwell Creek bridge site, told him of the accident immediately after it had happened. When Neuf subsequently saw the I-beam lying in the creek, the beam was broken, but there was nothing else "unusual" about it. When Neuf surveyed what had happened, he concluded that the I-beam had "rolled over" because there was "[t]oo much weight on the edge" of the overhang on top of it. Neuf indicated that the cause of the accident was "kind of obvious." Neuf testified that the jackhammer used to destroy the I-beam was a "breaker on a backhoe."

¶ 12    Jay Schmitt, Egyptian's plant manager, testified that Egyptian had been manufacturing I-beams for 25 years and had manufactured the prestressed concrete beam that had collapsed at the Maxwell Creek bridge. Schmitt generally described the I-beam's manufacturing process, and he indicated that the beam had been built and tested in accordance with IDOT's specifications. Schmitt testified that Ray Toland, "the State inspector," had personally witnessed the tests that had been performed on the test cylinders of the beam's concrete. Schmitt indicated that the I-beam had been stamped by the State and "wouldn't have left the plant" had there been "any problems in the testing." After the accident, when Keeley called about obtaining a replacement beam, Egyptian advised that it would manufacture one. Schmitt indicated that the metal plates that were removed from the old I-beam took "about six weeks to get," but since Egyptian was able to reuse them, the new beam was manufactured in a matter of days. Schmitt stated that if the old beam had broken due to "honeycombing" in the concrete, it would have been "very obvious." Schmitt further stated that although upon examination one "could possibly see" weakening voids in a broken concrete beam, if the I-beam that collapsed into Maxwell Creek had had any such voids, the beam "should have failed long before it got there." Schmitt testified that when he heard that the I-beam had fallen and broken, he assumed that it had broken "because of the fall," and he did not feel the need to go to the site and inspect the beam. Even though the situation was "unusual," he had no concerns "whatsoever" that the beam might have failed due to "bad concrete." Schmitt suggested that if there had been any weaknesses in the I-beam's concrete, a core test, rather than an X ray, would have been the preferable method of identifying them.

¶ 13    OSHA documents submitted as exhibits indicated that following its investigation of the accident at the Maxwell Bridge work site, OSHA proposed that Keeley pay a $2,500 fine for failing to ensure that the overhang scaffold supported by the I-beam was properly designed and erected. OSHA concluded that the scaffold "was not designed by a qualified person," as evidenced by its collapse. OSHA noted that the I-beam had not been properly "secured," and the scaffold "was not designed for the loads imposed on it." "Steve Gard stated that he directed the erection of the scaffold but had never erected this scaffold using the concrete beam as the support component." As for the cause of the accident, the documents stated, "I-beam and the entire scaffold became overloaded and rolled into the creek below it while five (5) employees were on the scaffold installing guardrails." "After the beam rolled on its side, it then failed at mid-beam." The documents indicated that OSHA interviewed numerous

witnesses and took "video and photos" at the scene. In a letter to OSHA, Keeley later set forth the "corrective measures" that it planned to "incorporate on all future projects involving concrete I-beams." In a letter to IDOT, Keeley referenced the accident and the replacement beam when requesting that its " 'Charged Working Days' " for the Maxwell Creek bridge project "be suspended" until it could "get the project back to where it was prior to [the] incident."

¶ 14     In a diary report, IDOT's resident engineer, Ronald Lindenberg, concluded that the I-beam at the Maxwell Creek bridge site had "rolled over and threw 5 workers onto the riprap and into the creek." The report further stated, "The I-beam was extensively damaged and will need replacing." The report noted that Donald McKinney of the Illinois State Police had been at the scene "to investigate." An internal IDOT memorandum regarding the accident stated that the I-beam had "rolled outward off the abutment and into the creek." The memorandum noted, "The beam was sitting on an elastomeric bearing assembly which the contractor believes may have contributed to the accident."

¶ 15     In November 2009, the circuit court entered an order granting summary judgment in favor of Keeley on the appellants' spoliation-of-evidence claims. Noting that the duty to preserve evidence presupposes the existence of one of the enumerated instances set forth in *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188 (1995), the court held that "none exist here." After denying the appellants' motions to reconsider, the circuit court granted their request for a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), and the present appeal followed.

¶ 16                                                ANALYSIS

¶ 17     "A motion for summary judgment should only be granted when the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423 (1998). "The purpose of summary judgment is not to try a question of fact, but simply to determine whether one exists." *Id.* "Because summary judgment is a drastic means of disposing of litigation, the court has a duty to construe the record strictly against the movant and liberally in favor of the nonmoving party." *Id.* at 423-24. "Summary judgment should not be allowed unless the moving party's right to judgment is clear and free from doubt." *Id.* at 424. "Accordingly, where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Id.* "Our review of an order granting summary judgment is *de novo*." *Id.*

¶ 18     "Spoliation of evidence is not an independent basis for a tort claim, but relief is available if a claim can be stated under ordinary negligence law." *Andersen v. Mack Trucks, Inc.*, 341 Ill. App. 3d 212, 215 (2003). "Thus, the plaintiff in a spoliation of evidence case must plead the existence of a duty, a breach of the duty, an injury proximately caused by the breach, and damages." *Id.*

¶ 19     In *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 195 (1995), our supreme court held:
        "The general rule is that there is no duty to preserve evidence; however, a duty to

preserve evidence may arise through an agreement, a contract, a statute [citation] or another special circumstance. Moreover, a defendant may voluntarily assume a duty by affirmative conduct. [Citation.] In any of the foregoing instances, a defendant owes a duty of due care to preserve evidence if a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action."

"*Boyd* thus articulated a two-prong test for determining when *** there is a duty to preserve evidence." *Dardeen v. Kuehling*, 213 Ill. 2d 329, 336 (2004). To satisfy the first, or "relationship," prong of the test, a party must establish that a duty to preserve evidence arose "by agreement, contract, statute, special circumstance, or voluntary undertaking." *Id.* If a duty to preserve is found, then the "foreseeability" prong of the test is used to determine "whether that duty extends to the evidence at issue–*i.e.*, whether a reasonable person should have foreseen that the evidence was material to a potential civil action." *Id.* Unless both prongs of the test are satisfied, "there is no duty to preserve the evidence at issue." *Id.*

¶ 20    Here, arguing, *inter alia*, that by preserving the I-beam for its own purposes, Keeley voluntarily undertook a duty to preserve the beam for other potential litigants, the appellants contend that the circuit court erred in granting Keeley's motion for summary judgment on their spoliation-of-evidence claims. We agree and accordingly hold that the appellants have satisfied the first, or relationship, prong of *Boyd*. We further find, however, that whether the appellants can meet *Boyd*'s foreseeability prong, *i.e.*, whether a reasonable person in Eugene's position should have foreseen that the I-beam was material to a potential civil action, is a question for a trier of fact.

¶ 21    In *Jones v. O'Brien Tire & Battery Service Center, Inc.*, 374 Ill. App. 3d 918, 921 (2007), following an automobile accident involving the insured's truck, which had recently had two wheels replaced at a tire center, the insurer's claims adjustor hired an accident reconstruction specialist to determine the accident's likely cause. After the specialist inspected the truck and the wheels, the claims adjuster told the insured to preserve the wheels, and the insured stored both the wheels and the truck. *Id.* at 922. Two years later, after the specialist issued his report finding that the wheels had been improperly installed, the insured had the truck repaired, and the wheels were apparently discarded in the process. *Id.* at 922-23. The tire center subsequently brought a spoliation-of-evidence action against the insurer and its insured due to the loss of the wheels, and the tire center ultimately obtained a judgment against the insurer. *Id.* at 923-24. On appeal, noting that it did not own the discarded wheels, the insurer maintained that "it did not owe the third-party plaintiffs a duty to preserve the evidence." *Id.* at 924, 926. After finding that the insurer had "exercised enough control over the evidence to allow it to take appropriate steps to preserve it," we determined that the insurer had voluntarily assumed a duty to preserve the evidence. *Id.* at 927. Specifically holding, "Once [the insurer] undertook to preserve the evidence for its own benefit, this voluntary undertaking imposed a duty to continue to exercise due care to preserve the evidence for the benefit of any other potential litigants," we thus found that the tire center had satisfied *Boyd*'s relationship prong. *Id.*

¶ 22    Here, Keeley, which undisputedly owned and controlled the I-beam, preserved it until IDOT and OSHA had completed their work-site inspections. As Eugene indicated, Keeley kept the beam until he felt that Keeley had "satisfied all of [its] obligations" to IDOT and

OSHA. Keeley employees also had the opportunity to inspect the beam before it was destroyed. Under the circumstances, we find that by preserving the I-beam for its own purposes, Keeley voluntarily undertook a duty to exercise due care to preserve the beam for the benefit of other potential litigants, including the appellants. We thus find that the appellants have satisfied *Boyd*'s relationship prong, and we accordingly reverse the circuit's court's judgment to the contrary. That said, however, we cannot find as a matter of law that the appellants have satisfied *Boyd*'s foreseeability prong.

¶ 23    Whether the duty to preserve extends to the evidence at issue does not always present a genuine issue of material fact. In product-liability cases or cases involving automobile accidents, for instance, that an item of evidence will be material to a potential civil action is often obvious or indisputable. See *Boyd*, 166 Ill. 2d at 195; *Brobbey v. Enterprise Leasing Co. of Chicago*, 404 Ill. App. 3d 420, 435-36 (2010); *Jones*, 374 Ill. App. 3d at 928; *Kambylis v. Ford Motor Co.*, 338 Ill. App. 3d 788, 792, 794 (2003). Here, however, whether a reasonable person in Eugene's position should have foreseen that the I-beam was evidence material to a potential civil action is not so clear.

¶ 24    Eugene testified that he had authorized the I-beam's destruction because IDOT wanted it moved, because there was no reason to believe that the beam itself had caused the accident, and because Egyptian had advised him that by salvaging the beam's steel ends, a replacement would be available sooner. None of the work-site inspections indicated that the I-beam had contributed to the accident, and Egyptian expressed no concerns that the beam might have been a contributing cause. Under the circumstances, one could find that it was reasonable for Eugene to conclude that the beam would not be material to a potential civil action, and arguably, any duty to preserve the beam might have ended after IDOT and OSHA inspected it. See *Andersen*, 341 Ill. App. 3d at 218 (holding that the duty to preserve evidence "remains as long as the defendant should reasonably foresee that further evidence material to a potential civil action could be derived from the physical evidence"). On the other hand, the I-beam was supporting the scaffolding from which the plaintiffs fell, and Eugene knew that at the very least, workers' compensation claims would stem from the accident. Additionally, while Eugene and Lehmann were conducting their work-site inspection, Eugene "took a bunch of pictures," thus demonstrating an awareness that it was important to document the scene. The injured plaintiffs reported hearing a "pop" sound immediately before the bridge collapsed, and Lehmann acknowledged that a weakened concrete beam can "explode" under stress. It is undisputed that at some point, the beam "failed right in the middle." We note that the record does not affirmatively indicate what Keeley's "obligations" to IDOT and OSHA were following the accident, and it appears that no one from either agency has been deposed.

¶ 25    "Ordinarily, the existence of a duty is a question of law to be determined by the court." *Jones*, 374 Ill. App. 3d at 933. Where the existence of a duty is dependent on disputed facts, however, the existence of the relevant facts is a question for a trier of fact to resolve. *Id.* It follows that where reasonable persons might draw different inferences from the undisputed facts from which a duty might be found, a trier of fact should make the relevant findings. We therefore hold that where, as here, reasonable persons might draw different inferences from the undisputed facts from which a duty to preserve evidence might be found, whether the foreseeability prong of the *Boyd* test has been met is a question for a trier of fact. We believe

-8-

that this holding is consistent with the rule that "[q]uestions which are composed of such qualities sufficient to cause reasonable men to arrive at different results should never be determined as matters of law." *Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 84 (1954). In any event, we conclude that on the record before us, whether a reasonable person in Eugene's position should have foreseen that the I-beam was material to a potential civil action presents a genuine issue of material fact not suitable for summary judgment.

¶ 26                                    CONCLUSION

¶ 27    For the foregoing reasons, we reverse the circuit court's judgment granting summary judgment in favor of the appellee and remand this cause for further proceedings.

¶ 28    Reversed and remanded.

¶ 29    JUSTICE SPOMER, dissenting:

¶ 30    I respectfully dissent. The general rule in Illinois is that there is no duty to preserve evidence in anticipation of litigation. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 195 (1995). Our Illinois Supreme Court has found a voluntary-undertaking exception in a case where a third party has instructed the owner of the property to retain the evidence for the purposes of an investigation, and has taken possession of said property, holding that the third party may be held liable for spoliation of evidence if the third party then loses the evidence. *Boyd*, 166 Ill. 2d at 195. In this case, Keeley & Sons did nothing more than allow government agencies to inspect its property in accordance with law. To extend the voluntary-undertaking exception to the owner of the property in question under these circumstances is tantamount to a finding that there is a general duty to preserve evidence in Illinois. I would decline to make a new pronouncement of law in this regard absent instruction from the legislature or our supreme court. For this reason, I would affirm the order of the circuit court of St. Clair County that granted a summary judgment in favor of Keeley & Sons on the spoliation-of-evidence claims.