# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Martin v. Keeley & Sons, Inc.*, 2012 IL 113270

---

| | |
|---|---|
| Caption in Supreme Court: | TERRY MARTIN *et al.*, Appellees, v. KEELEY & SONS, INC., Appellant. |
| Docket No. | 113270 |
| Filed | October 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where an I-beam which collapsed with workers on it was demolished the next day, a summary judgment for defendant construction company on a spoliation of evidence claim was affirmed where the general rule in Illinois is that there is no duty to preserve evidence and where the facts were insufficient to establish a duty based on a voluntary undertaking. |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of St. Clair County, the Hon. Michael J. O'Malley, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment affirmed. |

| Counsel on Appeal | Russell K. Scott and Dayna L. Johnson, of Greensfelder, Hemker & Gale, P.C., of Belleville, and Debbie S. Champion and Victor H. Essen II, of Rynearson, Suess, Schnurbusch & Champion LLC, of St. Louis, Missouri, for appellant. |
| | |
| | T. Michael Ward, of Brown & James, P.C., of St. Louis, Missouri, for appellee Allen Henderson & Associates, Inc. |
| | |
| | Charles L. Joley, Kenneth M. Nussbaumer and Georgiann Oliver, of Joley, Nussbaumer, Oliver, Dickerson & Beasley, P.C., of Belleville, for appellee Egyptian Concrete Company. |
| | |
| | Crowder & Scoggins, Ltd., of Columbia (Mark C. Scoggins and Anthony P. Gilbreth, of counsel), for appellees Terry Martin *et al.* |
| | |
| | Michael Resis, of SmithAmundsen LLC, of Chicago, for *amicus curiae* Illinois Association of Defense Trial Counsel. |
| | |
| Justices | JUSTICE BURKE delivered the judgment of the court, with opinion. Justices Freeman, Thomas, Garman, Karmeier, and Theis concurred in the judgment and opinion. Chief Justice Kilbride dissented, with opinion. |

**OPINION**

¶ 1    This appeal involves the duty owed by a defendant in a claim for negligent spoliation of evidence. At issue is whether defendant, Keeley & Sons, Inc. (Keeley), a general contractor, had a duty to preserve a concrete I-beam which was involved in an accident resulting in injuries to several employees. The circuit court of St. Clair County entered an order granting summary judgment for Keeley, finding that Keeley had no duty to preserve the I-beam. The appellate court reversed. 2011 IL App (5th) 100117. We now reverse the appellate court and affirm the circuit court.

¶ 2                                    BACKGROUND

¶ 3    On May 29, 2001, plaintiffs, Terry Martin, Ardith Wynn, and Rickey Vanover, were working on the reconstruction of a bridge over Maxwell Creek on Illinois Highway 154 near Sparta, Illinois. Plaintiffs were employed by Keeley, the general contractor for the bridge reconstruction project. While plaintiffs were installing a handrail on the bridge, a concrete

I-beam used to support the bridge deck upon which plaintiffs were standing collapsed, causing plaintiffs to fall into the creek where they were injured. Following the incident, the Illinois Department of Transportation (IDOT) and the Occupational Safety and Health Administration (OSHA) inspected the accident site. On May 30, the day after the accident, Keeley destroyed the I-beam by breaking up the concrete portion of the beam with a hydraulic hammer.

¶ 4    Plaintiffs filed suit against Keeley, the manufacturer of the I-beam, Egyptian Concrete Company (Egyptian), and the designer of the bearing assembly that supported the I-beam, Allen Henderson & Associates, Inc. (Henderson). Plaintiffs' claims against Keeley were based on negligent spoliation of evidence. In their third amended complaint, plaintiffs alleged that Keeley owed a duty to retain the beam as evidence in potential litigation, that it breached its duty by destroying the beam, and that, as a direct and proximate result of the breach, plaintiffs were unable to prove their underlying claims against Egyptian and Henderson. Those underlying claims alleged negligent design and manufacture of the I-beam, negligent design of the bearing assembly, and failure to warn of the defects.

¶ 5    Egyptian and Henderson subsequently filed counterclaims against Keeley, which also included claims for negligent spoliation of evidence. They alleged that Keeley's failure to preserve the I-beam prejudiced them in their defense of plaintiffs' claims against them. All of the parties filed motions and cross-motions for summary judgment on the negligent spoliation of evidence claims. The parties submitted the following evidence through discovery depositions and other documents.

¶ 6    Martin, Wynn, and Vanover testified that they and two other employees were installing a handrail on the Maxwell Creek bridge. The five employees were standing on plywood decking that rested on three prestressed concrete I-beams. The beams were laid horizontally and were sitting on heavy rubber pads on top of concrete bases on either side of the bridge. The beams were not tied or connected to each other, nor were they tied to solid portions of the incomplete bridge structure. The workers installing the handrail were standing on or near the outer I-beam on the north side of the bridge.

¶ 7    Vanover testified that, at around 3:30 p.m., he "heard something pop." He then fell into the creek. Martin testified that, "there was a loud pop and the bridge just collapsed." Similarly, Wynn testified that he "heard a crack or a pop sound" before falling onto rocks in the creek. Wynn stated that, after he fell, he could see that the I-beam had broken in the center and was lying "like it [had] flipped over." He testified that he did not know whether the beam rolled and then broke, or broke and then rolled. Wynn testified that, prior to the accident, he noticed that the beam had "moved a little bit" when another worker walked on it. He also noticed that the rubber pad under one end of the beam did not appear to be large enough to support the beam.

¶ 8    Plaintiffs were transported to the hospital following the accident and were not aware of the I-beam's destruction until well after the beam had been destroyed.

¶ 9    Eugene Keeley, Keeley's president, testified that he learned of the accident at about 4:30 p.m. on May 29. He traveled to the accident site and proceeded to observe the site and take pictures of the site for about one and a half to two hours. Two other Keeley employees, construction superintendent Shawn Neuf, and engineer Richard Lehmann, also visually

inspected the site. Keeley testified that he did not see any defects in the beam. He concluded that the beam had rolled over onto its side before it broke, based on the beam's position and the fact that it "failed right in the middle." Neuf testified that it was obvious from looking at the beam that the beam had rolled over onto its side before it broke.

¶ 10 Lehmann testified that he noticed nothing unusual about the beam itself based on his visual inspection of the I-beam. Lehmann stated that he performed some calculations in order to determine whether the approximate weight load of the employees on the bridge was great enough to cause the beam to roll over. Based on his calculations, Lehmann concluded that the employees' weight could have caused the beam to roll.

¶ 11 Keeley testified that Ron Lindenberg, the resident engineer for IDOT, also inspected the site on May 29. In a written diary entry for that date, Lindenberg wrote:

> "An accident occurred at approximately 3:45 p.m. The exterior beam of stage 1 (Maxwell Creek) rolled over and threw 5 workers onto the riprap and into the creek. The I-beam was extensively damaged and will need replacing. Four workers treated and released from Sparta Hospital. Fifth worker kept overnight. Officer Donald McKinney of Illinois State Police on jobsite to investigate and file report."

¶ 12 Keeley testified that on May 30, the day after the accident, an OSHA representative inspected the site. The OSHA representative concluded that the beam had rolled, as evinced by statements made in an OSHA report, dated May 31, 2001:

> "The Carp. foreman stated that he had not received any instruction regarding the installation of the scaffold and just presumed to install the scaffold as he had done previously on steel beams as the support structure. The scaffold collapsed when the concrete beam became overloaded due to the weight of the employees and scaffold platform, and the beam rolled over into the creek, platform and employees as well."

¶ 13 In October 2001, OSHA issued several citations and notifications of penalties to Keeley, noting in part that "[e]ach scaffold and scaffold component was not capable of supporting, without failure, its own weight and at least 4 times the maximum intended load applied or transmitted to it," and "the entire scaffold became overloaded and rolled into the creek below."

¶ 14 Following the OSHA inspection on May 30, Keeley told workers to break up the beam.[1] The beam was not moved from where it had fallen. Keeley employees broke up the concrete portion of the beam with a hydraulic hammer and left the concrete as "riprap," or large rocks, in the creek. The rebar was hauled to an auto shredder. The embeds—embedded steel plates on the ends of the beam—were saved and sent to Egyptian to be used in the manufacture of a replacement beam. Egyptian subsequently manufactured the replacement beam using the original embeds, based on the original shop drawings.

¶ 15 In his testimony, Keeley acknowledged that the beam could have been preserved by bringing in equipment to lift the beam and remove it from the site, or by using concrete saws to cut off the ends of the beam. Nevertheless, Keeley testified, he had several reasons for his

---

[1]Neuf testified that the I-beam was destroyed at 8:30 a.m. on May 30. Keeley testified that that time was "not correct." There is no dispute that the I-beam's destruction took place on that date.

decision to destroy the beam. First, he was informed by Egyptian that the replacement beam could be manufactured more quickly if they retrieved and sent the embeds to Egyptian as soon as possible. Secondly, Keeley testified that Jerry Wibbenmeyer, the construction engineer from IDOT, advised that the beam needed to be removed from the creek to prevent a condition known as "scouring"—erosion caused by water washing up around the abutment. Finally, Keeley stated that he felt that the company had satisfied all of its obligations to IDOT and OSHA, that they had identified the cause of the accident, and that "it was just kind of a move-on-from-there situation."

¶ 16    Keeley testified that he knew workers had been sent to the hospital and assumed there would be workers' compensation claims, but that a lawsuit "really didn't enter my mind at the time." Keeley stated he did not receive any requests to preserve the beam from plaintiffs, Egyptian, or Henderson.

¶ 17    Timothy Dillo, Egyptian's quality systems manager, testified that the I-beams for the bridge project were manufactured and tested according to specifications for IDOT, PCI (Precast Prestressed Concrete Institute), and ACI (American Concrete Institute).

¶ 18    Jay Schmitt, an Egyptian plant manager, testified that he learned of the accident on the date of the accident or the following day, when Keeley called to order a replacement beam. Schmitt did not go to the accident site, nor did he ask what happened to the beam. He was told that the beam rolled over or fell. When asked whether he or anyone from Egyptian asked Keeley for an opportunity to inspect the beam, Schmitt answered, "yes." However, later in his deposition, Schmitt testified that at the time of Keeley's phone call to order a replacement beam, Schmitt did not see a need to go to the accident site to inspect the beam. Schmitt testified that he was unaware of another instance where a beam broke or fell under similar circumstances. He stated that he had no concerns that the beam was manufactured incorrectly. According to Schmitt, a defect in the beam, such as "honeycombing" in the concrete, would have been obvious, and the beam never would have left Egyptian's plant. Moreover, Schmitt testified, had there been a void in the concrete, the beam likely would have failed when it was loaded onto a truck before it reached the bridge site.

¶ 19    In an affidavit, Christopher Kohlrus, Henderson's vice president, stated that no personnel from Henderson were present at the construction site. He stated that Keeley never contacted Henderson to notify it of the accident or to inquire whether a Henderson representative wished to inspect the site. Kohlrus stated that Henderson was not aware of the accident until well after Keeley destroyed the I-beam.

¶ 20    After considering the aforementioned evidence, the circuit court found that Keeley had no duty to preserve the I-beam for the benefit of plaintiffs and counter-claimants. The court granted summary judgment in favor of Keeley on the negligent spoliation of evidence claims. The remaining parties' summary judgment motions were denied.

¶ 21    On appeal, the appellate court reversed and remanded the cause for further proceedings. 2011 IL App (5th) 100117. A majority of the court held that, "by preserving the I-beam for its own purposes, Keeley voluntarily undertook a duty to exercise due care to preserve the beam for the benefit of other potential litigants." *Id.* ¶ 22. After concluding that Keeley had voluntarily undertaken a duty to preserve the beam, the majority held that the case was not suitable for summary judgment due to a genuine issue of material fact. That issue was

whether a reasonable person in Keeley's position should have foreseen that the beam was material to a potential civil action. *Id.* ¶ 25. Accordingly, the trial court's order granting summary judgment was reversed, and the cause was remanded for further proceedings. *Id.* ¶¶ 27-28.

¶ 22　　The dissenting justice in the appellate court disagreed that Keeley had a duty to preserve the I-beam, contending that Keeley "did nothing more than allow government agencies to inspect its property in accordance with law," and that "[t]o extend the voluntary-undertaking exception to [Keeley] under these circumstances is tantamount to a finding that there is a general duty to preserve evidence in Illinois." *Id*. ¶ 30 (Spomer, J., dissenting).

¶ 23　　This court allowed Keeley's petition for leave to appeal pursuant to Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)). We granted leave to the Illinois Association of Defense Trial Counsel to file a brief *amicus curiae* in support of Keeley. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 24　　　　　　　　　　　　　　　　ANALYSIS

¶ 25　　At issue is whether Keeley is entitled to summary judgment on the spoliation of evidence claims filed by plaintiffs and counter-claimants. Summary judgment is proper where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). Where the parties file cross-motions for summary judgment, as they did in this case, they agree that only a question of law is involved, and they invite the court to decide the issues based on the record. *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 22 (citing *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 309 (2010)). Questions of law, including orders granting summary judgment, are reviewed *de novo* by this court. *Id.*

¶ 26　　Under Illinois law, spoliation of evidence is a form of negligence. *Dardeen v. Kuehling*, 213 Ill. 2d 329, 335-36 (2004); *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 194-95 (1995). Accordingly, a plaintiff claiming spoliation of evidence must prove that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages. *Dardeen*, 213 Ill. 2d at 336; *Boyd*, 166 Ill. 2d at 194, 196. The circuit court below granted summary judgment for Keeley, finding that Keeley had no duty to preserve the I-beam as evidence in plaintiffs' underlying claims against Egyptian and Henderson. Thus, we are asked to decide whether Keeley owed a duty to preserve the I-beam.

¶ 27　　The general rule in Illinois is that there is no duty to preserve evidence. *Boyd*, 166 Ill. 2d at 195. In *Boyd*, we set forth a two-prong test which a plaintiff must meet in order to establish an exception to the general no-duty rule. *Id.* Under the first, or "relationship," prong of the test, a plaintiff must show that an agreement, contract, statute, special circumstance, or voluntary undertaking has given rise to a duty to preserve evidence on the part of the defendant. *Id.*; *Dardeen*, 213 Ill. 2d at 336. Under the second, or "foreseeability," prong of the *Boyd* test, a plaintiff must show that the duty extends to the specific evidence

at issue by demonstrating that "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Boyd*, 166 Ill. 2d at 195. If the plaintiff fails to satisfy both prongs of the *Boyd* test, the defendant has no duty to preserve the evidence at issue. *Dardeen*, 213 Ill. 2d at 336.

¶ 28      In the instant case, there are no allegations that an agreement, contract, or statute required Keeley to preserve the I-beam as evidence. The appellate court held, however, that Keeley voluntarily undertook to preserve the I-beam for its own purposes, thus satisfying the first prong of the duty analysis. 2011 IL App (5th) 100117, ¶ 22. Alternatively, plaintiffs argue that additional "special circumstances," *i.e.*, Keeley's exclusive possession and control of the evidence, Keeley's status as plaintiffs' employer, and Keeley's status as a potential litigant, gave rise to a duty to preserve evidence. We disagree that any of the foregoing bases supports a duty in this case.

¶ 29                              I. Voluntary Undertaking

¶ 30      The appellate court held that Keeley voluntarily undertook a duty to preserve the I-beam as evidence, based on the court's finding that Keeley preserved the beam for its own purposes. 2011 IL App (5th) 100117, ¶ 22. The court relied on the following facts: (1) Keeley's ownership, possession, and control of the beam; (2) Keeley's preservation of the beam until IDOT and OSHA had completed their work-site inspections; and (3) Keeley employees' own inspection of the beam before it was destroyed. *Id.* We disagree that the foregoing facts are sufficient to establish a voluntary undertaking by Keeley.

¶ 31      A voluntary undertaking requires a showing of affirmative conduct by the defendant evincing defendant's intent to voluntarily assume a duty to preserve evidence. *Boyd*, 166 Ill. 2d at 195 (citing *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 74 (1964)). There is no evidence in the record that Keeley voluntarily undertook to preserve the I-beam for the purpose of potential future litigation. Even if Keeley "preserved" the evidence for its own investigative purposes, which is questionable, since Keeley never performed any testing of the beam or moved the beam from the place where it fell, plaintiffs must demonstrate affirmative conduct by Keeley showing its intent to voluntarily undertake a duty to the plaintiffs. They have failed to do so. The following cases are illustrative on this point.

¶ 32      In *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 191 (1995), the plaintiff was working inside a van belonging to his employer when a portable propane heater belonging to the plaintiff exploded, causing serious injuries. Subsequently, a claims adjustor and another employee of the company's workers' compensation insurer paid a visit to the plaintiff's home. The insurance employees took possession of the heater, telling the plaintiff's wife that they needed it to investigate her husband's workers' compensation claim. *Id.* They also said that they would inspect and test the heater to determine the cause of the explosion. The claims adjustor took the heater to the insurance office and placed it in a closet, where it was lost and never tested. *Id.*

¶ 33      The plaintiff and his wife filed a complaint against the workers' compensation insurer for negligent spoliation of evidence, claiming that the loss of the heater prejudiced and adversely affected their products liability action against the manufacturer. *Id.* at 192. This court held that the plaintiffs' complaint satisfied the relationship prong of the two-prong duty

analysis because, under these circumstances, the insurer voluntarily assumed a duty to preserve the plaintiff's property. *Id.* at 195. The relevant factors in the *Boyd* court's analysis were that the insurer's employees removed the heater from the plaintiff's home, took it into their possession for the purpose of investigating the workers' compensation claim, and knew that the heater was evidence relevant to future litigation. *Id.*

¶ 34    In contrast to *Boyd*, the court in *Jackson v. Michael Reese Hospital & Medical Center*, 294 Ill. App. 3d 1 (1997), held that the facts pled in the plaintiffs' complaint were insufficient to constitute a voluntary undertaking by the defendant. However, because there was evidence in the record that the defendant did, in fact, assume a duty to preserve the evidence in anticipation of litigation, the court allowed the plaintiffs to replead their complaint. *Id.* at 18-19. The plaintiffs, a minor and his mother, alleged that the defendant hospital's loss or destruction of certain X rays caused them to be unable to prove their underlying medical malpractice claim. They alleged that the hospital assumed a duty to preserve the X rays by affirmative conduct based on: (1) the hospital's retention of medical records beyond the statutorily required period; (2) the hospital's ongoing treatment of the plaintiff; and (3) the hospital's agreement to follow an accreditation manual regarding medical records. *Id.* at 11.

¶ 35    Although the appellate court found that the complaint failed to allege fact-specific conduct by which the hospital voluntarily assumed a duty to maintain the X rays, the court reversed and remanded to allow the plaintiffs to replead their complaint based on additional evidence in the record. *Id.* at 11-13, 18-19. Specifically, the plaintiffs failed to plead facts stated in the record that the hospital segregated the X rays into a special litigation file but later lost the X rays. *Id.* at 11. Under these and other facts, the court held, it could be alleged that the defendant, knowing the X rays were material to future litigation, chose to treat the X rays in a specific manner because of the pending litigation. *Id.* at 12. The court held, "[b]y such conduct defendant may have voluntarily assumed a duty to preserve the X rays and breached its duty by losing them, not unlike the employees who lost the heater in the *Boyd* case." *Id.*

¶ 36    The facts in the instant case fall short of what the courts required in *Boyd* and *Jackson* in order to establish a voluntary undertaking to preserve evidence. Unlike the defendants in those cases, Keeley did not manifest an intention to preserve the I-beam as evidence or even acknowledge the significance of the I-beam as evidence in potential future litigation. Keeley never moved the I-beam from its position in the creek where it fell. Nor did it relocate the beam to a place where it would be protected from loss or destruction. Although Keeley employees visually inspected the I-beam, and Keeley allowed IDOT and OSHA investigators to inspect the I-beam and the accident site, these actions fall short of taking affirmative steps to preserve the I-beam as evidence. A voluntary undertaking requires some affirmative acknowledgment or recognition of the duty by the party who undertakes the duty. *Rogers v. Clark Equipment Co.*, 318 Ill. App. 3d 1128, 1134-35 (2001). In the absence of any affirmative conduct showing Keeley's intent to undertake a duty to preserve the I-beam, we find no support for the appellate court's conclusion that Keeley assumed a duty to plaintiffs through a voluntary undertaking.

¶ 37                                     II. Special Circumstances

¶ 38         As an alternative to the voluntary undertaking theory of liability, plaintiffs contend that
        Keeley owed a duty to preserve the I-beam based on the following "special circumstances":
        (1) Keeley's exclusive possession and control of the I-beam; (2) Keeley's status as plaintiffs'
        employer; and (3) Keeley's status as a potential litigant.

¶ 39         Illinois courts have not precisely defined a "special circumstance" in the context of
        recognizing a duty in a spoliation of evidence claim. However, in *Miller v. Gupta*, 174 Ill.
        2d 120 (1996), we hinted at what special circumstances might give rise to a duty to preserve
        evidence. See *Dardeen v. Kuehling*, 213 Ill. 2d 329, 338 (2004). In *Miller*, 174 Ill. 2d at 122-
        23, a plaintiff who had undergone surgery on her foot brought an action against her
        physician alleging malpractice and spoliation of evidence for allowing her X rays to be
        destroyed. The trial court dismissed the plaintiff's complaint with prejudice. *Id.* at 122. This
        court affirmed the appellate court's judgment allowing the plaintiff to replead her complaint
        to conform with the *Boyd* decision, which was filed while the plaintiff's appeal was pending.
        *Id.* at 128.

¶ 40         Our decision in *Miller* made special mention of evidence in the record that might
        constitute "special circumstances" supporting a duty by the defendant upon repleading of the
        complaint: (1) the plaintiff's medical malpractice attorney requested the plaintiff's X rays
        from her doctor; (2) in response to the request, the doctor obtained the X rays and placed
        them on the floor in his office prior to taking them to the hospital for copying; (3) the doctor
        admitted that his wastebasket was located three feet from where he placed the X rays; (4) a
        housekeeper who was assigned to clean the doctor's office testified that she regularly
        disposed of X ray jackets located in or near the trash; and (5) the housekeeper stated her
        belief that the plaintiff's X rays were thrown out when she cleaned the office and were later
        destroyed in the hospital's incinerator. *Miller*, 174 Ill. 2d at 123-24, 129.

¶ 41         The factors in *Miller* supporting a "special circumstances" exception to the no-duty rule
        were notably absent in *Dardeen*, 213 Ill. 2d 329. In that case, the plaintiff, a newspaper
        carrier, was injured when he fell in a hole on a brick sidewalk next to someone's home. *Id.*
        at 331. The owner of the home called State Farm Insurance Company (State Farm) to report
        the accident and asked the agent whether she could remove the bricks in order to prevent
        further injuries. The agent said yes. That evening, the plaintiff returned to the site to see the
        hole but took no photographs of it. A few days later, the homeowner removed 25 to 50 bricks
        from the area. The plaintiff subsequently brought premises liability claims against the
        homeowner and spoliation of evidence claims against the homeowner and State Farm. *Id.*
        at 331-32. The circuit court entered summary judgment for State Farm, and the appellate
        court reversed. *Id.* at 332.

¶ 42         This court affirmed the entry of summary judgment for State Farm, finding that the
        plaintiff failed to establish that the insurer owed a duty to preserve the sidewalk. *Id.* at 338-
        40. In so holding, we distinguished *Miller*, noting several key differences in the facts:

                "Unlike the plaintiff in *Miller*, [plaintiff] never contacted the defendant to ask it
                to preserve evidence. [Plaintiff] never requested evidence from State Farm, and he
                never requested that State Farm preserve the sidewalk or even document its
                condition. And though he visited the accident site hours after he was injured, he did

                                                -9-

not photograph the sidewalk. Additionally, unlike the doctor in *Miller*, State Farm never possessed the evidence at issue and, thus, never segregated it for the plaintiff's benefit." *Id.* at 338.

¶ 43                          A. *Keeley's Possession and Control of the Evidence*

¶ 44     Relying on the "special circumstances" exception discussed in *Miller* and *Dardeen*, plaintiffs contend that Keeley's exclusive possession and control of the I-beam constituted a special circumstance under which Keeley had a duty to preserve the beam. Plaintiffs contend that a defendant's possession and control of evidence, in itself, is sufficient to establish the relationship prong of the *Boyd* test. Plaintiffs base their contention on our discussion of possession in *Dardeen*. There, we noted that "no Illinois court has held that a mere opportunity to exercise control over the evidence at issue is sufficient to meet the relationship prong" and that "[t]he record here indicates that State Farm had neither possession nor control over [defendant's] sidewalk and, therefore, owed [plaintiff] no duty to preserve it." *Dardeen*, 213 Ill. 2d at 339.

¶ 45     Contrary to plaintiffs' contention, we did not hold in *Dardeen* that a defendant's possession and control of the evidence, standing alone, is sufficient to establish a duty to preserve the evidence. Rather, we held that State Farm's lack of possession or control over the sidewalk defeated the plaintiff's spoliation claim. It is clear from the context of the *Dardeen* decision that something more than possession and control are required, such as a request by the plaintiff to preserve the evidence and/or the defendant's segregation of the evidence for the plaintiff's benefit.

¶ 46     We recognize that plaintiffs in this case had little or no opportunity to request that Keeley preserve the I-beam before it was destroyed on the day following the accident. Nevertheless, plaintiffs and counter-claimants bear the burden of establishing all elements of their spoliation claims. The general rule is that a defendant has no duty to preserve evidence, unless the plaintiff can show that an exception applies. See *Dardeen*, 213 Ill. 2d at 336. Plaintiffs have failed to show that Keeley's mere possession and control of the I-beam constitute special circumstances giving rise to a duty by Keeley to preserve the beam.

¶ 47                          B. *Keeley's Status As Plaintiffs' Employer*

¶ 48     Plaintiffs next contend that Keeley's status as plaintiffs' employer supports a duty to preserve evidence because Keeley exclusively possessed and controlled the instrumentalities and environment of its employees' labor. No Illinois case has held that an employer-employee relationship is sufficient to establish a duty to preserve evidence, nor do plaintiffs offer any other authority for their argument. Moreover, plaintiffs fail to offer a compelling reason as to why an employer-employee relationship in itself is a special circumstance justifying a duty imposed upon an employer to preserve potential evidence. We thus decline to find that Keeley's status as plaintiffs' employer establishes a duty owed by Keeley to preserve the I-beam.

¶ 49                          C. *Keeley's Status As a Potential Litigant*

¶ 50 Plaintiffs' final argument is that, as a potential litigant, Keeley had a duty to other potential litigants to preserve material evidence. In support, plaintiffs cite *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112 (1998). However, spoliation of evidence, as a cause of action intended to impose liability for a defendant's loss or destruction of evidence, was not at issue in *Shimanovsky*. Rather, in that case, the defendant moved for discovery sanctions against the plaintiffs for altering a key piece of evidence prior to filing suit. *Id.* at 115. This court held that discovery sanctions against the plaintiff were not an abuse of the trial court's discretion, because "a potential litigant owes a duty to take reasonable measures to preserve the integrity of relevant and material evidence." *Id.* at 121. Underlying this rationale was the "court's concern that, were it unable to sanction a party for the presuit destruction of evidence, a potential litigant could circumvent discovery rules or escape liability simply by destroying the proof prior to the filing of a complaint." *Id.* at 121-22.

¶ 51 Plaintiffs' argument that the reasoning in *Shimanovsky* is applicable to a claim for negligent spoliation of evidence has been considered, and rejected, previously by this court. In *Dardeen*, 213 Ill. 2d at 339, we found that *Shimanovsky* was inapposite to the issue of whether a defendant owes a duty to preserve evidence in a spoliation of evidence claim. We similarly reject plaintiffs' contention here. The issues in that case and the policies underlying our holding were entirely different from those in the case at bar. The standards for stating a claim for spoliation of evidence have been set forth by this court in *Boyd*. The test applied by this court in *Shimanovsky* is not relevant to spoliation and thus does not support plaintiffs' argument.

¶ 52                                    CONCLUSION

¶ 53 We find no evidence in the record to support the existence of a duty to preserve the I-beam based on a voluntary undertaking by Keeley or other special circumstance. Thus, we need not address the "foreseeability" prong of the *Boyd* test, because plaintiffs have not established that a duty to preserve evidence arose under the "relationship" prong of the test. In the absence of a duty, plaintiffs' and counter-claimants' spoliation of evidence claims cannot stand. See *Dardeen*, 213 Ill. 2d at 335 (if a plaintiff fails to establish any element of his claim, summary judgment is appropriate). Accordingly, we reverse the appellate court's judgment and affirm the circuit court's judgment on its order granting summary judgment for Keeley.

¶ 54 For the foregoing reasons, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

¶ 55 Appellate court judgment reversed.

¶ 56 Circuit court judgment affirmed.

¶ 57 CHIEF JUSTICE KILBRIDE, dissenting:

¶ 58 Because I believe the unique factual circumstances of this case sufficiently establish the "relationship" prong of the *Boyd* test, I respectfully dissent from the majority's reversal of the appellate court judgment that reversed the entry of summary judgment for the defendant,

Keeley. Due to its disposition of the arguments, the majority opinion addresses only the first, or "relationship," prong of the *Boyd* test and fails to reach the second, or "foreseeability," prong. Thus, I also limit my comments to the first *Boyd* prong.

¶ 59　　In analyzing the "relationship" prong, the majority rejects the plaintiffs' claim that Keeley had a duty to preserve the I-beam based on "special circumstances." *Supra*. Although the majority correctly notes that "a defendant's possession and control of the evidence, standing alone, is sufficient to establish a duty to preserve the evidence" (*supra* ¶ 45), its conclusion that the plaintiffs here have not shown special circumstances must fail. The record shows far more than Keeley's mere possession and control. Citing *Dardeen*, the majority gives two examples of additional facts that could create "special circumstances." Those examples include a preservation request by the plaintiff and the defendant's segregation of the evidence. *Supra* ¶ 45.

¶ 60　　As the majority notes (*supra* ¶ 46), here the plaintiffs had virtually no opportunity to request that the I-beam be preserved before they were hospitalized because it was destroyed the day after the bridge collapsed. Accordingly, they "were not aware of the I-beam's destruction until well after the beam had been destroyed." *Supra* ¶ 8. Despite the obvious impossibility of the plaintiffs requesting the preservation of the I-beam before it was destroyed, the majority inexplicably faults them for their failure to satisfy their strict "burden of establishing all elements of their spoliation claims." *Supra* ¶ 46. This court has never construed the plaintiffs' burden in such an unjust and unyielding manner, and it is particularly inappropriate under the unique factual circumstances of this case.

¶ 61　　The facts in *Dardeen* are illustrative. There, "though [the injured plaintiff] visited the accident site hours after he was injured, he did not photograph the sidewalk" or request it be preserved in its original condition. *Dardeen*, 213 Ill. 2d at 338. The bricks in the sidewalk remained in place for a few days after the plaintiff's fall, but the plaintiff took no steps to document their condition before their removal. In contrast, here the key piece of evidence in the plaintiffs' case against the I-beam manufacturer, the I-beam itself, was destroyed without notice to the plaintiffs the day after they were hospitalized due to injuries they suffered when the bridge collapsed.

¶ 62　　Unlike the plaintiff in *Dardeen*, these plaintiffs cannot fairly be seen as having sat on their options or as having failed to make a timely preservation request. The majority has unwittingly allowed Keeley to turn the shield created by the plaintiffs' burden of proof into a sword by eliminating any realistic opportunity for the plaintiffs here to satisfy the requirements for showing the "special circumstances" as hinted at in *Miller v. Gupta*, 174 Ill. 2d 120 (1996), and *Dardeen*, 213 Ill. 2d at 338.

¶ 63　　Moreover, I fail to see why "the policies underlying our holding [in *Shimanovsky*] were entirely different from those in the case at bar." *Supra* ¶ 51. In cases involving both sanctions for discovery violations and negligence actions for the spoliation of evidence, the common underlying rationale is this " 'court's concern that *** a potential litigant could circumvent discovery rules *or escape liability* simply by destroying the proof prior to the filing of a complaint.' " (Emphasis added.) *Supra* ¶ 50 (quoting *Shimanovsky*, 181 Ill. 2d at 121-22). By including specific references to both litigants who attempt to "escape liability" by destroying evidence and those who violate discovery rules, we clearly invoke the same

-12-

policy rationale.

¶ 64    Here, Keeley testified that he recognized the need both to satisfy "all of its obligations to IDOT and OSHA" and to "identif[y] the cause of the accident." *Supra* ¶ 15. He also "knew workers had been sent to the hospital and assumed there would be workers' compensation claims," but he did not concern himself with the latter lawsuit. *Supra* ¶ 16. Based on Keeley's admitted recognition that the accident would be the basis for future litigation and that the plaintiffs could not act on their own behalf because they were hospitalized, the plaintiffs have shown he was a likely litigant. Although the majority rejects this factor based on the alleged inapplicability of *Shimanovsky* (*supra* ¶¶ 50-51), I believe the same policy rationale supports the plaintiff's claim of "special circumstances" in this spoliation of evidence case.

¶ 65    The record further shows that Keeley's actions effectively precluded the plaintiffs from establishing the "special circumstances" necessary to avoid the entry of summary judgment against them on their spoliation of evidence claim. They had no opportunity to request the I-beam, or its preservation, prior to its complete destruction by the defendant. Furthermore, Keeley admits that the destruction of that critical piece of evidence was not even necessary. "In his testimony, Keeley acknowledged that the beam could have been preserved by bringing in equipment to lift the beam and remove it from the site, or by using concrete saws to cut off the ends of the beam." *Supra* ¶ 15. This testimony conflicts with his claim that he decided, in part, to destroy the I-beam with a jackhammer because "the replacement beam could be manufactured more quickly if they retrieved and sent the embeds to Egyptian [the manufacturer] as soon as possible." *Supra* ¶ 15. Notably, he did not testify that cutting the embeds off the beam using concrete saws would slow the replacement process. Cutting off the ends of the beam would have also had the obvious advantage of retaining critical evidence needed by the plaintiffs in their potential claim against the manufacturer.

¶ 66    Although the IDOT's construction engineer "advised that the beam needed to be removed from the creek to prevent a condition known as 'scouring'—erosion caused by water washing up around the abutment," he did not testify that its immediate removal was required. Keeley also recognized that the beam could have been removed from the site, making its complete destruction unnecessary to comply with the IDOT's recommendation. *Supra* ¶ 15.

¶ 67    Summary judgment is "a drastic measure and should be allowed only 'when the right of the moving party is clear and free from doubt.' " *Dardeen*, 213 Ill. 2d at 335. Under the unique facts of this case, I do not believe the issue of whether Keeley had a duty to preserve the key piece of evidence necessary for the plaintiffs' case is sufficiently free and clear from doubt under this court's readily distinguishable precedents to justify reversal of the appellate court's judgment and reinstatement of summary judgment for Keeley. Accordingly, I respectfully dissent from the majority opinion because I think the plaintiffs have sufficiently established Keeley's duty to preserve the I-beam as evidence under the "special circumstances" exception to the first prong of the *Boyd* test. In my view, we should proceed to consider the application of the second, "foreseeability," prong of that test.