2024 IL App (1st) 230763-U

No. 1-23-0763

Order filed June 20, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| AJA SEATS, Special Administrator for Deceased Person JOHN CHRISTOPHER KYLES, and SABRINA WRIGHT, Guardian for DUANE DUNLAP, a Disabled Adult, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 2019 L 012256 |
| THE VILLAGE OF DOLTON, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable Elizabeth M. Budzinski, Judge, presiding. |

JUSTICE R. VAN TINE delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the jury's verdict in plaintiffs' favor on their claim of spoliation of evidence over defendant's contentions that (1) the trial court should have "bifurcated" plaintiffs' willful and wanton and spoliation claims, (2) plaintiffs failed to prove their spoliation claim, (3) giving Illinois Pattern Jury Instruction

5.01 was error, (4) plaintiffs' counsel made improper comments during closing argument, and (5) the trial court should have given defendant's proposed special interrogatory.

¶ 2 Plaintiff Aja Seats is the special administrator for the estate of the late John Kyles and plaintiff Sabrina Wright is the guardian of Duane Dunlap, a disabled adult. Plaintiffs sued defendant the Village of Dolton, among others, claiming that an October 9, 2016, police chase resulted in severe and permanent injuries and death to Dunlap and Kyles, respectively. A jury returned a verdict in Dolton's favor on plaintiffs' willful and wanton claim and in plaintiffs' favor on their claim of spoliation of evidence, which arose out of the loss or destruction of a police dashboard camera video of this incident. The jury awarded plaintiffs $33.5 million in damages. On appeal, Dolton argues that (1) the trial court should have "bifurcated" plaintiffs' spoliation claim from their willful and wanton claim, (2) plaintiffs failed to prove their spoliation claim, (3) the trial court erred by giving Illinois Pattern Jury Instruction (IPI) 5.01, (4) plaintiffs' closing argument was improper, and (5) the trial court should have given Dolton's proposed special interrogatory. For the following reasons, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4                      A. Initial Pleadings and Motion to Dismiss

¶ 5 Plaintiffs filed this lawsuit in 2016. In 2018, Dolton filed a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2016)), which the trial court granted in part and denied in part. In 2019, plaintiffs voluntarily dismissed this lawsuit pursuant to section 2-1009 of the Code of Civil Procedure (735 ILCS 5/2-1009 (West 2018)).

¶ 6 Plaintiffs refiled the case on November 5, 2019. Their complaint alleged that at approximately 1 a.m. on October 9, 2016, Demetrius Sorrells was driving near the intersection of

Greenwood Road and Sibley Boulevard in Dolton, Illinois. Kyles and Dunlap were passengers in Sorrells's vehicle. Dolton police sergeant Lewis Lacey and Dolton police officer Ryan Perez chased Sorrells's vehicle at a high rate of speed for approximately one mile until Sorrells's vehicle crashed into the rear of a building. Kyles died at the scene and Dunlap suffered severe and permanent injuries. Plaintiffs further alleged that Perez's police vehicle had a dashboard camera that recorded the chase. Plaintiffs served a preservation letter on Dolton police chief Robert Collins on October 17, 2016, and the court entered a preservation order on October 21, 2016. Notwithstanding the letter and order, Dolton never produced video from Perez's dashboard camera. Relevant here, plaintiffs alleged claims of willful and wanton conduct, negligent training and supervision, and spoliation of evidence.

¶ 7                                    B. Trial

¶ 8    The case proceeded to a jury trial that began on July 26, 2022, and ended on August 3, 2022.[1]

¶ 9    Lacey testified that he was on duty as a supervisor on October 9, 2016. At approximately 1 a.m., he was driving southbound on Greenwood Road. As Lacey approached the intersection with California Avenue, he saw a vehicle driven by Sorrells traveling northbound. Sorrells's vehicle slid through the stop sign at the intersection, then drove away. Lacey made a U-turn, activated his emergency lights, and attempted to conduct a traffic stop of Sorrells's vehicle for running the stop sign. By the time Lacey finished his U-turn, he could see Sorrells's vehicle at the intersection at Greenwood and Irving Avenue. Lacey also testified that Sorrells's vehicle was three

---

[1]For brevity, we set out only the procedural history and trial evidence relevant to the issues on appeal.

to four blocks away by the time he completed the U-turn, and additionally claimed that he could no longer see Sorrells's vehicle at that point. However, Lacey also acknowledged that he could see all of Greenwood from California Avenue to Chicago Road because it was "a clear night; you c[ould] literally see the whole street." Lacey testified that there was no traffic that night and the roads were dry.

¶ 10    As Lacey attempted to catch up to Sorrells's vehicle, he reached speeds of 71 to 75 miles per hour at the intersection of Greenwood and Irving. He testified that he had slowed to 25 to 35 miles per hour by the time he reached the next intersection, Greenwood and 144th Street. Lacey saw Sorrells drive into the oncoming lane of traffic and pass Perez's police vehicle. Lacey then saw Perez activate his vehicle's emergency lights and follow Sorrells. At trial, Lacey initially claimed that he lost sight of Perez's vehicle at some point, but upon being confronted with his prior deposition testimony Lacey admitted that he could see Perez's vehicle at all times during this incident. As Lacey crossed 144th Street, Perez was ahead of him at the next intersection, Greenwood and Chicago Road. At Chicago Road, Greenwood becomes a one-way street called Lou Boudreau Drive, which ends in a T-intersection at 142nd Street. Sorrells's vehicle was driving the wrong way down Lou Boudreau Drive and Lacey saw a cloud of smoke or dust. Lacey estimated that Sorrells was driving "close to a hundred" miles per hour during this incident. Approximately one minute passed between Lacey making a U-turn and seeing the cloud of smoke or dust.

¶ 11    Lacey testified that he did not know how long Perez had been on scene when Lacey arrived, but then admitted his prior deposition testimony that Perez reached the crash scene "a few seconds" before him was true. Lacey arrived at the location where Sorrells' vehicle crashed and saw two

individuals attempting to flee the crashed vehicle; at least one was apprehended. Lacey then "took charge of the scene" and directed other officers to contact the chief of police, the commander, the day shift officers, and detectives. At some point later, Lacey learned that someone had been killed in the crash.

¶ 12    Lacey testified that he was responsible for dashboard cameras being installed in Dolton police vehicles and that he oversaw dashboard camera maintenance. A dashboard camera is mounted to the front of a police vehicle and captures what the officer sees through the windshield. A dashboard camera begins recording audio and video automatically when a police vehicle's lights or sirens are activated and automatically uploads video recordings to a server when the vehicle returns to the police station. Lacey testified that he did not know whether Perez's vehicle was equipped with a dashboard camera on October 9, 2016. The following exchange occurred:

> "[PLAINTIFFS' COUNSEL]. If Officer Perez had a working dash camera in his car and he activated his lights, then video would have been created, correct?
>
> A. Correct.
>
> Q. And that video automatically would have downloaded to a server?
>
> A. It should have, if it was working properly.
>
> Q. All right. And that server is where?
>
> A. It's at the station."

Lacey testified that he did not investigate whether Perez's vehicle had a dashboard camera because he did not know which vehicle Perez was driving. No one from the Dolton police department asked Lacey whether Perez's vehicle had a dashboard camera. Lacey testified that, generally, he would

retrieve dashboard camera video from an incident involving a pursuit, but that this incident was not a pursuit.

¶ 13    Perez testified that he was on patrol on October 9, 2016. Lacey was his supervisor. At approximately 1 a.m., Perez was driving northbound on Greenwood Road and saw Lacey pass him going southbound. When Perez was between Greenwood's intersections with Sanderson Avenue and Irving Avenue, he noticed flashing red and blue lights from Lacey's vehicle in his rearview mirror and saw headlights approaching him from behind at a high rate of speed. Perez then saw Sorrells's vehicle drive into the oncoming traffic lane, while passing him. Perez activated his emergency lights and sirens, "maneuvere[ed] around" another vehicle in front of him, moved into the oncoming traffic lane, and accelerated to catch up to Sorrells's vehicle. Perez never lost sight of Sorrells's vehicle but was never close enough to read its license plate number.

¶ 14    Perez saw Sorrells's vehicle drive through stop signs at the intersections with Irving Avenue and 144th Street. Perez did not see Sorrells's vehicle crash, but he saw a cloud of dust and debris, which he assumed indicated that Sorrells's vehicle had crashed. When Perez arrived at the scene of the crash, he saw Sorrells exit his vehicle and attempt to flee on foot. Perez exited his vehicle, ran up to Sorrells's vehicle, and apprehended him. Perez did not recall exactly when Lacey arrived at the crash scene but acknowledged that Lacey may have arrived a few seconds after him. Perez denied that he was ever "on Mr. Sorrells's tail" or that Lacey was ever "right on [Perez's] tail."

¶ 15    Perez initially testified that he did not recall whether his vehicle was equipped with a dashboard camera on October 9, 2016. However, upon being confronted with his prior deposition testimony, he admitted that his vehicle did have a dashcam. The dashboard camera would have

started recording audio and video automatically when Perez activated his vehicle's lights and sirens. Any video the dashboard camera recorded would have been available on the vehicle's hard drive or uploaded to "the cloud." Perez did not know whether his dashboard camera was working properly on the night of the incident but had no reason to believe it was not working properly. Perez did not know whether his vehicle's dashboard camera recorded video of this incident and had never seen such a video. He did not investigate whether the dashboard camera recorded any video because that was Lacey's responsibility as his supervisor. No one asked Perez any questions about his vehicle's dashboard camera video.

¶ 16    Dolton police chief Collins testified that he spoke with Lacey and other officers on scene on October 9, 2016. He also reviewed police reports and GPS data relating to the incident. Collins testified that "whatever [dashboard camera] video did exist [he] did review," as he reviewed and preserved dashboard camera videos relating to all serious incidents.

¶ 17    Plaintiffs introduced Sorrells's testimony via his videotaped deposition. Sorrells testified that on the night of the incident, he was driving and his friends, Kyles, Dunlap, and Keon Lee were passengers in his vehicle.[2] Sorrells turned onto Greenwood Road from Sibley Boulevard and saw a police vehicle make a U-turn behind him and activate its emergency lights. Sorrells accelerated and tried to flee because he had been drinking and did not have a driver's license. Sorrells did not intend to stop "[no] matter what the cops were doing." One police vehicle pursued him on Greenwood Road between the intersections with Sibley Boulevard and Chicago Road. Sorrells remembered seeing his vehicle on fire, being handcuffed in the rear seat of a police vehicle and

---

[2]Keon Lee is not a party and the record contains no other information as to his involvement in this case.

feeling pain all over his body while at the police station. He did not remember running any stop signs or stop lights, how fast he was driving, crashing his vehicle, exiting his vehicle, running from police, being transported to or treated at the hospital, or leaving the hospital. Several days after the incident, Sorrells told detectives that the only thing he remembered was waking up in the hospital after turning onto Greenwood Road.

¶ 18    Jay Przybyla was qualified as an expert in forensic engineering and accident reconstruction. Przybyla analyzed Global Positioning System (GPS) data from Lacey and Perez's police vehicles. GPS data reflected each vehicle's location expressed as latitude and longitude coordinates in 15-second intervals, and for certain triggering events such as sudden acceleration or deceleration. From that data, Przybyla mapped both police vehicles' locations and speeds during this incident, which he presented to the jury in a PowerPoint. The GPS data showed that shortly after Lacey made a U-turn at Greenwood and California and began driving north on Greenwood, his vehicle was travelling 51 miles per hour. Lacey accelerated to 77 miles per hour before reaching the intersection of Greenwood and Irving Avenue. Between that intersection and shortly past the intersection of Greenwood and 144th Street, Lacey was travelling between 63 and 78 miles per hour, with an average speed of 68 miles per hour. Between 144th Street and Chicago Road, Lacey's maximum speed was 56 miles per hour and his average speed was 29 miles per hour. The distance between the intersection of Greenwood and California and the crash site was approximately 8/10 of a mile.

¶ 19    GPS data from Perez's vehicle showed that it was travelling at 30 miles per hour on Greenwood from the intersection with Sanderson to the intersection with 144th Street, slowing down at each intersection's stop sign. Three seconds after Perez crossed 144th Street, his speed

increased to 55 miles per hour. Przybyla opined that this increase in speed indicated when Sorrells's vehicle passed Perez. Between 144th Street and Chicago Road, Perez's maximum speed was 63 miles per hour and his average speed was 48 miles per hour. Perez slowed to 35 miles per hour as he crossed Chicago Road and then stopped at the crash scene. Approximately 30 seconds elapsed from the time that Perez sped up to pursue Sorrells's vehicle to the time Perez's vehicle stopped at the crash site.

¶ 20    GPS data also reflected the positions of Lacey and Perez's vehicles relative to each other. When Lacey made a U-turn at Greenwood and California, Perez was travelling northbound on Greenwood halfway between Irving and 144th Street. When Perez was halfway between 144th Street and Chicago Road, he was travelling approximately 55 miles per hour and Lacey was "very close" behind him, travelling an average of 68 miles per hour. Lacey never passed Perez.

¶ 21    Sorrells's vehicle provided no GPS data. However, based on inferences from Lacey and Perez's GPS data, Przybyla estimated that Sorrells's maximum speed was 72 miles per hour and his average speed was 63 miles per hour.

¶ 22    Przybyla opined that the dashboard camera video from Perez's vehicle would have been critical to showing how close the officers' vehicles were to Sorrells's vehicle.

¶ 23    Dennis Waller was qualified as an expert in police practices. Waller opined Perez should have ensured that his vehicle's dashboard camera was working properly when he started his shift on October 9, 2016, but he did not. Lacey, as supervisor and the individual responsible for dashboard cameras within the Dolton Police Department, should have retrieved the video from Perez's dashboard camera but he did not. Waller also opined that because this incident was a

"significant event," Dolton police should have reviewed and preserved any video that Perez's dashboard camera recorded.

¶ 24    Plaintiffs read the following stipulations into evidence: On October 21, 2016, the court ordered Dolton to preserve all dashboard camera video recordings and any other recordings made by Dolton police vehicles pertaining to this incident. On December 22, 2016, plaintiffs served Dolton with a request to produce "all police vehicle video camera, dashcam records" and for "documents and things, including all police video camera, dashcam records."

¶ 25    Sabrina Wright testified to Dunlap's injuries and damages.

¶ 26    Dolton called John Ryan, who was qualified as an expert in police practices. He testified regarding police practices related to vehicle pursuits. During his testimony, plaintiffs questioned Ryan about a screen capture from a dashboard camera video from a police vehicle driven by an Officer Bruno on October 9, 2016.[3]

¶ 27    The trial court admitted all exhibits the parties used during trial into evidence, including photographs of the crash scene, GPS data, police reports, and Przybyla's PowerPoint.

¶ 28    In closing, plaintiffs argued that Dolton failed to produce dashboard camera video from Perez's vehicle and offered no explanation for not producing it. Plaintiffs emphasized that Lacey was responsible for installing dashboard cameras in Dolton police vehicles, Perez acknowledged that his vehicle had a dashboard camera, and Dolton produced a dashboard camera video from Officer Bruno's vehicle. Dolton argued that Perez's dashboard camera video was not preserved because the incident was not a pursuit. Specifically, defense counsel stated: "It wasn't on

---

[3]Bruno did not testify at trial. However, plaintiffs' complaint alleged that he arrived at the scene of the crash approximately two minutes after Perez.

anybody's radar screen to save a video. Did they save the other videos? Sure. I don't know why. That's never explained. There's nothing that varies about it, whatsoever." Dolton also argued that the missing video would not have shown whether Lacey's conduct was willful and wanton because he was driving behind Perez.

¶ 29    The jury found for Dolton on the willful and wanton claim and for plaintiffs on the spoliation claim and awarded a total of $33,500,000 in damages.

¶ 30                                  C. Posttrial Motions

¶ 31    Following trial, Dolton filed a combined motion for judgment notwithstanding the verdict (judgment *n.o.v.*) and a motion for a new trial. The motion for judgment *n.o.v.* argued that (1) the court erred in finding that Dolton had a duty to preserve evidence, (2) the Tort Immunity Act granted Dolton immunity as to the spoliation claim, (3) the evidence did not support giving IPI 5.01, (4) the court erred in refusing to bifurcate the willful and wanton claim from the spoliation claim, (5) IPI 5.01 led to an inconsistent verdict, and (6) plaintiffs failed to prove their spoliation claim. Dolton's motion for a new trial argued that (1) IPI 5.01 misled the jury on plaintiffs' burden of proof as to the spoliation claim, (2) the court erred in refusing a special interrogatory that Dolton proposed, and (3) plaintiffs' closing argument was improper.

¶ 32    In response, plaintiffs argued that (1) Dolton forfeited its argument as to duty to preserve evidence, (2) Dolton forfeited its argument as to immunity, (3) the officers' testimony supported giving IPI 5.01, (4) Dolton failed to timely request bifurcation, (5) Dolton's special interrogatory was improper, and (6) the trial court struck any supposedly improper statements in closing argument.

¶ 33    The trial court denied Dolton's posttrial motions and Dolton timely appealed.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, Dolton argues that (1) the trial court should have "bifurcated" plaintiffs' willful and wanton and spoliation claims, (2) plaintiffs failed to establish three of the four elements of their spoliation claim, (3) the trial court erred by giving Illinois Pattern Jury Instruction (IPI) 5.01, (4) plaintiffs' counsel made improper comments during closing argument, and (5) the trial court should have given Dolton's proposed special interrogatory.

¶ 36                                    A. "Bifurcation"

¶ 37    Dolton first contends that the trial court should have "severed and bifurcated" plaintiffs' willful and wanton claim from their spoliation claim. However, Dolton did not seek actual severance and bifurcation in the sense of having separate trials for each claim. See 735 ILCS 5/2-614(b), 2-1006 (West 2022) (allowing a trial court to sever claims and hold separate trials on them). Rather, Dolton wanted one jury to decide both claims in one trial but wanted the jury to know that it had to reach a verdict on the willful and wanton claim before considering the spoliation claim.

¶ 38    Dolton initially raised "severance and bifurcation" as an alternative form of relief in its second motion *in limine*, which primarily sought to bar evidence and argument of spoliation. To the extent this is an issue concerning the denial of a motion *in limine*, we review for an abuse of discretion See *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4 (2007). To the extent it is an appeal from the denial of an actual motion to bifurcate under sections 2-614(b) or 2-1006 of the Code of Civil Procedure, we also review for an abuse of discretion. See *Village of New Athens v. Smith*, 2021 IL App (5th) 200257, ¶¶ 29-30. An abuse of discretion occurs when a trial

court's ruling is arbitrary or fanciful, or when no reasonable person would take the trial court's view. *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 815 (2008).

¶ 39　Dolton's basis for this argument is our supreme court's decision in *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188 (1995). *Boyd* holds that when a plaintiff alleges a claim for spoliation of evidence and an underlying substantive claim, one trier of fact should resolve both claims because

"[a] single trier of fact would be in the best position to resolve all the claims fairly and consistently. If a plaintiff loses the underlying suit, only the trier of fact who heard the case would know the real reason why. This factor is important because a spoliator may be held liable in a negligence action *only* if its loss or destruction of the evidence caused a plaintiff to be unable to prove the underlying suit." (Emphasis in original.) *Id.* at 198.

¶ 40　That is exactly what occurred in this case. Both of plaintiffs' claims were tried before a single jury. The trial court instructed the jury that it could consider the spoliation claim only after finding for Dolton on the willful and wanton claim. The court also instructed the jury that it could find for plaintiffs on the spoliation claim only if the jury found that the loss or destruction of Perez's dashboard camera video proximately caused plaintiffs' inability to prove their willful and wanton claim. Dolton fails to explain how the trial court misapplied *Boyd*. We find that it did not.

¶ 41　　　　　　　　　　　B. Spoliation Claim

¶ 42　Dolton challenges plaintiffs' spoliation claim on the merits. Our supreme court has explained that

"a plaintiff claiming spoliation of evidence must prove that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or

destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages." *Martin v. Keely & Sons, Inc.*, 2012 IL 113270, ¶ 26. In this appeal, Dolton challenges the first three elements but not the fourth.

¶ 43                                    1. Duty to Preserve Evidence

¶ 44    Dolton first contends that it had no duty to preserve Perez's dashboard camera video. In Illinois, a court determines whether a party had a duty to preserve evidence by applying a two-pronged test. *Id.* ¶ 27 (citing *Boyd*, 166 Ill. 2d at 195). The first prong asks whether such a duty arose by agreement, contract, statute, special circumstances, or voluntary undertaking. *Id.* If so, the second prong asks whether a reasonable person should have foreseen that the evidence was material to a potential lawsuit. *Id.* If the plaintiff does not satisfy both prongs, there is no duty to preserve evidence. *Dardeen v. Kueheling*, 213 Ill. 2d 329, 336 (2004).

¶ 45    The procedural history of this issue is convoluted. In 2018, the trial court granted Dolton's section 2-619 (735 ILCS 5/2-619 (West 2018)) motion to dismiss in part, finding that, to the extent plaintiffs alleged a duty to preserve evidence arising out of state law or police department procedures, section 2-103 of the Tort Immunity Act (745 ILCS 10/2-103 (West 2018)) granted Dolton immunity from suit. However, plaintiffs' spoliation claim ultimately survived the motion to dismiss. Neither party moved for summary judgment on this or any other issue. During trial, the parties sporadically argued about whether Dolton had a duty to preserve evidence but, as we will explain below, the court did not rule on that issue. Rather, the jury was asked to decide whether Dolton had a duty to preserve evidence and found that it did. In ruling on Dolton's posttrial motions, the trial court claimed that Dolton argued that "the Court erred in submitting to the jury

the question of whether the Village of Dolton had a duty to preserve dashcam videos [because] that duty is always a question of law." But that was not an accurate statement of Dolton's posttrial argument; rather, Dolton argued that the *court* found a duty to preserve and then improperly submitted the spoliation *claim* to the jury. Dolton's argument on appeal is that, at trial, the court "reversed" its own motion to dismiss ruling and found that Dolton had a duty to preserve evidence based on Collins and Lacey's testimony about the Dolton Police Department's evidence preservation procedures and policies.

¶ 46    The record does not reflect that the trial court made any ruling on Dolton's duty to preserve evidence. The court considered the issue of duty to preserve at several points during trial. During a July 25, 2022, hearing on motions *in limine*, the court took under advisement the issue of duty to preserve and asked the parties to provide case law on that matter. On July 27, while discussing what the parties could mention in opening statements, the court indicated that it was "not sure that there's special circumstances that rise to a spoliation claim" but that it needed to hear the evidence on that issue. The following day, the court stated that it had not ruled definitively on a defense motion *in limine* regarding the spoliation claim and again deferred ruling until the parties presented further evidence. On August 1, the court decided to give IPI 5.01 over Dolton's objection that "there is no duty to preserve [evidence]." The court correctly explained that IPI 5.01 does not include an element of duty to preserve and that IPI 5.01 and a spoliation claim "are two separate and distinct things." The court also questioned whether the duty to preserve evidence "ha[d] to be a statutory duty" and said it would "look at the cases again." The court concluded the August 1, 2022, discussion by saying, "Let me pass on the spoliation claim, I need to look at it. You need to give me proper instructions on the spoliation claim."

¶ 47 On August 2, the court deferred ruling on Dolton's motion for a directed verdict on the spoliation claim. Immediately thereafter, in anticipation of plaintiffs resting their case, the parties argued about admitting plaintiffs' preservation letter as evidence. The court initially indicated it would admit the letter and stated:

> "I know [Dolton] think[s] the letter is the catchall. And I looked at the case law last night, and I don't think that is the trigger point here. I know that you want it to be, but I don't think that's the trigger point. I think you've got—one, you've got Officer Lacey's testimony, and Officer Collins' testimony creates a duty; and two, I think you have special circumstances here. The Dolton Police Department in the ordinary course of business investigates and maintains evidence for potential litigation, albeit primarily criminal, but they know civil suits happen as well. And these are special circumstances that create a duty.
>
> It's foreseeable that there would be criminal litigation and potentially civil litigation when you have a crash like this. The department understood that this was significant. There was a press conference. And like I said, the police department, that's what they do. They investigate and maintain evidence."

This discussion ended without a ruling. The court concluded by saying, "[L]et me think about how I'm going to deal with this, and let's get going with the morning." The parties then proceeded to defendant's case in chief. On August 3, Dolton stated that it wanted to "preserv[e] the record *** since there wasn't a court reporter yesterday afternoon when we chatted" and "object[ed] to the spoliation claim going to the jury." The court responded, "[A]fter hearing the evidence, I think there's a spoliation claim."

¶ 48 In all these proceedings, we can find no ruling by the trial court that Dolton had a duty to preserve Perez's dashboard camera video. At most, the exchange on August 3 referenced an off-the-record discussion the day prior that may have included a denial of Dolton's motion for directed verdict on the spoliation claim. But we cannot speculate as to what occurred in off-the-record discussions. See *Webster v. Hartman*, 195 Ill. 2d 426, 436 (2001) ("[A] reviewing court cannot look beyond the record and speculate on what may have occurred in the trial court. A court of review is limited to the record before it."). The record before us reflects no ruling by the trial court as to whether Dolton had a duty to preserve evidence.

¶ 49 What the record *does* reflect is that the jury decided that Dolton had a duty to preserve evidence. The jury was ultimately instructed that, to find in plaintiffs' favor on the spoliation claim, it had to conclude that Dolton "had a duty to preserve the dashcam video from Officer Perez's police vehicle." The jury found for plaintiffs on the spoliation claim, so the jury necessarily found that, under the facts as they decided them, Dolton had a duty to preserve evidence. The trial court's ruling on Dolton's posttrial motions also confirms that the jury, not the court, resolved the issue of duty to preserve. That ruling stated that the court "submit[ted] to the jury the question of whether the Village of Dolton had a duty to preserve the dashcam videos."

¶ 50 The issue with this approach is that " '[t]he existence of a duty is a question of law for the court to decide [whereas] the issues of breach and proximate cause are factual matters for a jury to decide.' " *Nunez v. Diaz*, 2017 IL App (1st) 170607, ¶ 33 (quoting *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 44 (2004)). That is true of the "duty to preserve evidence[,] which Illinois law makes a question of law for the Court to determine." *Forsythe v. Black Hills Corp.*, No. 04 C 5361,

2008 WL 373177, *10 (N.D. Ill. Feb. 8, 2008) (citing *Pelham v. Griesheimer*, 92 Ill. 2d 13, 18-19 (1982)).

¶ 51    However, Dolton has forfeited any claim of error arising from allowing the jury to decide whether Dolton had a duty to preserve evidence. Dolton did not object to the spoliation jury instruction that tasked the jury with deciding that question, did not propose an alternate instruction or additional instructions, and did not raise this issue in its posttrial motion. See *Deal v. Byford*, 127 Ill. 2d 192, 202-03 (1989) ("To preserve an objection to a jury instruction a party must both specify the defect claimed and tender a correct instruction"). Dolton's appellate brief does not raise this issue either. In fact, Dolton's brief expressly states that it did *not* argue that the existence of a duty to preserve evidence was a question of law that the jury should not have decided. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in the appellant's opening brief are forfeited). Even if allowing the jury to decide a question of law was error, we cannot reverse based on issues that the parties have not argued. See *Tuna v. Wisner*, 2023 IL App (1st) 211327, ¶ 54.

¶ 52    We disagree with Dolton's suggestion that the trial court "reversed" its own ruling on the motion to dismiss. As explained above, during trial, the court did not rule on the issue of duty to preserve evidence. Furthermore, the motion to dismiss ruling was interlocutory (see *Van Der Hooning v. Board of Trustees of University of Illinois*, 2012 IL App (1st)111531, ¶ 6), and the trial court was free to modify or depart from it at any time before entry of final judgment (see *Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 53). Accordingly, we affirm based solely on Dolton's forfeiture and we decline to reach the merits of whether Dolton had a duty to preserve evidence.

¶ 53                                    2. Breach

¶ 54    Dolton also challenges the second element of spoliation, breach of the duty to preserve evidence. In the context of spoliation of evidence, breach means that the defendant did not exercise reasonable care in protecting and preserving the evidence. *Jones v. O'Brien Tire and Battery Service Center, Inc.*, 374 Ill. App. 3d 918, 930 (2007); *Village of Roselle v. Commonwealth Edison Co.*, 368 Ill. App. 3d 1097, 1117 (2006); see also *Andersen v. Mack Trucks, Inc.*, 341 Ill. App. 3d 212, 218 (2003) ("In the usual case, where the plaintiff has had no opportunity to inspect the evidence in contemplation of litigation, establishing the inadequate protection of the evidence would be sufficient to plead the breach of the duty."); *Jackson v. Michael Reese Hospital and Medical Center*, 294 Ill. App. 3d 1, 13 (1997) (allegation that hospital failed to protect X rays against flood or fire damage was sufficient to allege breach of duty to preserve the X rays).

¶ 55    When a party in a civil trial contends that the jury's verdict was against the manifest weight of the evidence, we will only set the verdict aside if "the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary[,] and not based upon any of the evidence." (Internal quotation marks omitted.) *Gehrett v. Chrysler Corp.*, 379 Ill. App. 3d 162, 171-72 (2008). We will uphold the jury's verdict so long as there is credible evidence to support it and will only disturb the verdict if "there is no evidence that fairly tends to support the verdict." (Internal quotation marks omitted.) *Id.* at 172.

¶ 56    Dolton first raised its sufficiency of the evidence argument in its motion for judgment *n.o.v.* and now raises it in the context of its appeal from the denial of its motion for judgment *n.o.v.* We review the trial court's ruling on a motion for judgment *n.o.v. de novo*, meaning that we apply the same standard as the trial court. *Harris v. Thompson*, 2012 IL 112525, ¶ 15. "A motion for

judgment *n.o.v.* should only be granted when all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors a movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. The standard for entry of judgment *n.o.v.* is high and is not warranted if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Id.* ¶ 37. Under these two standards—manifest weight and judgment *n.o.v.*—we reach the same conclusion, which is that the evidence was sufficient to support the jury's finding in plaintiffs' favor on their spoliation claim.

¶ 57                          a. Perez's Dashboard Camera

¶ 58    The first question is whether Perez's police vehicle had a dashboard camera. If it did not, no video could exist. At trial, Perez testified that he did not know or remember whether his police vehicle was equipped with a dashboard camera on October 9, 2016. However, he acknowledged that he testified at his deposition that his vehicle did have a dashboard camera and that that testimony was true. That was the only trial evidence that Perez's police vehicle had a dashboard camera. For clarity, we set out the relevant parts of Perez's questioning by plaintiffs' counsel:

"Q. All right. Your police car had a dashcam, correct?

A. I don't recall if it had a dashcam.

***

Q. Is this a subject you've thought about, whether your car had a dashcam or not?

A. I mean, not something I've thought about. But, I mean, I don't know if it had one or not.

***

A. All right. Do you remember giving this answer to this question at your deposition? And we don't have the video, but I'll read it, page 142, lines 21 to 24.

'Question: And you were aware, though, that your vehicle had what is called a dashcam, correct?'

And your answer was, 'Correct.'

Question to you: Did you give that answer under oath?

A. Yes.

Q. Was it true?

A. At the time, I guess so.

***

Q. Sure. You were asked in 2019 if your car had a dashcam, and you said correct, right?

A. That's correct.

***

Q. All right. So you stand by that answer under oath?

A. Yeah. I stand by it if you're reading the deposition. Like I said, I don't even remember what vehicle I had.

Q. I'm going to give you page 142, and you see if you stand by it. Okay? It's at the bottom. 21 to 24. Then you stand by that answer?

A. That's what I gave in my deposition."

From this testimony, a jury could reasonably conclude that Perez's vehicle did in fact have a dashboard camera on October 9, 2016.

¶ 59    Dolton argues that plaintiffs could not use Perez's deposition testimony substantively and that the above exchange was merely impeachment, *i.e.*, this testimony did not constitute evidence that Perez's police vehicle had a dashboard camera. See *Van Steemburg v. General Aviation, Inc.*, 243 Ill. App. 3d 299, 328 (1993) ("A party may not, in the guise of impeachment, offer a prior statement of a witness as substantive evidence."); see also *Kayman v. Rasheed*, 2015 IL App (1st) 132631, ¶ 60 (" 'Evidence of prior inconsistent statements by a witness is admissible to impeach his credibility [but] is not admitted as proof of the truth of the facts stated out of court' ") (quoting *People v. Moses*, 11 Ill. 2d 84, 87 (1957)). However, Dolton did not raise that objection during Perez's testimony. Dolton raised other objections during the exchange set out above, such as objections to form, mischaracterization of Perez's answers, and repetitive questions. But Dolton never objected to plaintiffs' apparent use of Perez's deposition testimony as substantive evidence. Therefore, Dolton has forfeited any such argument. See *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1132 (2000) ("Failure to object to evidence at trial forfeits the issue on appeal."). Plaintiffs introduced one piece of evidence that Perez's police vehicle was equipped with a dashboard camera, and that is enough for us to leave the jury's spoliation verdict intact. See *Lawlor*, 2012 IL 112530, ¶ 37; *Gehrett*, 379 Ill. App. 3d at 172.

¶ 60                              b. Existence of the Dashboard Camera Video

¶ 61    The next question is whether Perez's dashboard camera recorded video of this incident, and if so, what it recorded. Lacey and Perez both testified that dashboard cameras automatically begin recording when a police vehicle's lights or sirens are activated. Perez testified that he

activated his vehicle's lights and sirens just after Sorrells's vehicle passed him on Greenwood north of 144th Street. Perez testified that he followed Sorrells northbound on Greenwood Road and that he never lost sight of Sorrells's vehicle. Perez saw a cloud of dust or smoke from where Sorrells's vehicle crashed, then saw at least one man attempt to flee the vehicle on foot. It is reasonable to infer that Perez's forward-facing dashboard camera captured what Perez saw, *i.e.*, Sorrells's vehicle driving on Greenwood Road north of Chicago Road, dust or smoke from the crash, and the immediate aftermath. There is no indication that Perez manually turned off his dashboard camera and there is no suggestion that the camera malfunctioned.

¶ 62   Although the evidence of what Perez did in the hours after the crash is sparse, it is reasonable to infer that he returned to the police station at some point. Lacey testified that dashboard camera videos are automatically uploaded to a server when a police vehicle arrives at the station, so it is reasonable to conclude that Perez's dashboard camera video most likely ended up on that server and was available to Dolton police. Perez's testimony suggested that the video was also accessible on his vehicle's hard drive. Accordingly, the evidence sufficiently established that Perez's dashboard camera recorded a video of this incident, which was available to Dolton police.

¶ 63            c. Lack of Efforts to Preserve the Dashboard Camera Video

¶ 64   The next question is what steps, if any, Dolton police took to protect and preserve Perez's dashboard camera video. Perez testified that he did not investigate whether his dashboard camera recorded any video because that was the responsibility of his supervisor, Lacey. Yet Lacey testified that he did not investigate whether Perez's vehicle was equipped with a dashboard camera. Even if it was, Lacey did not investigate whether Perez's dashboard camera recorded video of this

incident because, according to him, this incident was not a "pursuit" (even though he also testified that whether this incident was a "chase" would not govern whether video existed or was preserved). Perez testified that Lacey asked him no questions about dashboard camera video recordings. The jury heard that, 12 days after this incident, a court entered an order requiring Dolton to preserve evidence related to it. Yet Dolton never produced the video.

¶ 65    There is no dispute that Dolton police can retrieve dashboard camera videos. In this case, Dolton retrieved and produced a dashboard camera video from Bruno's vehicle. It is reasonable to infer that Bruno's dashboard camera functioned the same way as Perez's, saved video for the same length of time and in the same manner, uploaded video to the same server at the same police station, and was subject to the same departmental procedures regarding recovery and preservation of video. Dolton police not only investigated whether Bruno's dashboard camera recorded video of this incident, but also recovered and produced that video. Yet they did not take any of the same steps with respect to Perez's dashboard camera. That evidence supports an inference that Dolton could have recovered Perez's dashboard camera video but instead either allowed it to be deleted or simply did not produce it in this lawsuit.

¶ 66    The totality of the evidence supported the following factual findings: Perez's police vehicle was equipped with a dashboard camera on October 9, 2016, which began recording video when he activated his lights and sirens on Greenwood north of 144th Street. Perez's dashboard camera captured a video of Sorrells's vehicle driving northbound on Greenwood and then onto Lou Boudreau Drive, and, at a minimum, a cloud of dust or smoke from the crash. That video was available to Dolton police. Nevertheless, Dolton police did not investigate whether Perez's police vehicle had a dashboard camera or whether it recorded video and took no action to recover that

video. As a result, the video either no longer exists or was never produced. Those facts support a finding of breach of the duty to preserve evidence.

¶ 67    Dolton's reliance on *People v. Althoff*, 2020 IL App (2d) 180993, is misplaced. *Althoff* is a criminal case that says nothing about how a plaintiff can prove a spoliation claim in a civil case. *Althoff* concerned whether the State's failure to produce a video in a criminal case was a discovery violation. *Id.* at ¶ 23. Moreover, in *Althoff*, the police officer checked whether a video recording of a traffic stop uploaded to a storage system, found that it did not, and informed multiple supervisors of the issue. *Id.* at ¶¶ 6-11. That is the opposite of this case in which, apparently, nobody investigated whether Perez's dashboard camera created a video or uploaded it to the server at the Dolton police station. *Althoff* is distinguishable and does not compel reversal. Accordingly, the evidence established that Dolton breached its duty to preserve evidence.

¶ 68                                    3. Causation

¶ 69    Dolton also challenges the third element of spoliation, causation. The third element of spoliation requires proof that the loss or destruction of the evidence caused the plaintiff to be unable to prove an underlying lawsuit. *Boyd*, 166 Ill. 2d at 196. A plaintiff need only show a *reasonable probability* of prevailing in the underlying claim if he had been able to present the lost or destroyed evidence. *Id* at 196 n. 2. The plaintiff does not have to prove that he *actually would have* prevailed on the underlying claim. *Id.*

¶ 70    Video evidence is extremely persuasive (*People v. Wilson*, 2020 IL App (1st) 162430, ¶ 51) because it presents an objective view of the facts (*People v. Kladis*, 2011 IL 110920, ¶ 28). Our supreme court has found that videos of police interactions in traffic are "an integral part of those encounters, objectively documenting what takes place by capturing the conduct and words

of both parties." *Kladis*, 2011 IL 110920, ¶ 29. For that reason, "the General Assembly [places] great importance upon the production and preservation of video recordings made by squad car cameras during law enforcement actions." *Id.* ¶ 30. For example, the legislature has mandated that Illinois State Police vehicles be equipped with video and audio recording equipment, and that such recordings must be retained for at least 90 days. *Id.* ¶ 31 (citing 20 ILCS 2610/30(b), (f) (West 2008)). It has also imposed a general requirement that when *any* law enforcement agency makes police vehicle video and audio recordings in connection with law enforcement or investigative duties, the recording must be retained for at least 90 days, and cannot be destroyed without a court order when they are evidence in a civil or criminal case. *Id.* ¶ 32 (citing 720 ILCS 5/14-3(h-15) (West 2010)).

¶ 71    In this case, a video of the final stage of the chase would have been an important and persuasive piece of evidence. The video would have depicted Dolton police pursuing Sorrells down Greenwood Road and onto a narrow one-way street in the direction of oncoming traffic approaching a dead-end T-intersection. While the jury knew *that* these events occurred, the jury was not able to see *how* they occurred. Perez's dashboard camera video would have shown real-time traffic, lighting, and weather conditions during the chase, as well as any obstructions or hazards near the path of the chase. The video could have undermined the officers' insistence that this incident was somehow not a "chase" or "pursuit." Most importantly, as Przybyla explained, police vehicles' GPS data could not depict their position relative to Sorrells's vehicle, which "would have been critical and captured by the dash cam video from those patrol cars."[4] Essential to the jury's willful and wanton determination was whether the officers were following Sorrells's

---

[4]Dolton's opening brief concedes this point: "At most, any dash cam [video] would have captured footage based on Perez's vehicle in space and time to Sorrells'[s] vehicle, not Lacey's."

vehicle at a safe distance that would have allowed Sorrells to slow down and stop without a rear-end crash, or whether the officers were in overly tight proximity to Sorrells's rear bumper. The GPS could not have captured what the video would have shown.

¶ 72    Dolton's suggestion that Perez's dashboard camera video would have shown nothing of importance because he was in front of Lacey is unpersuasive. Perez's video would have shown a clearer depiction of the chase as outlined above. In addition, the GPS evidence indicated that Lacey was close behind Perez during the final segment of the chase, between 144th Street and Chicago Road. Dolton's attempt to portray Perez and Lacey—Perez's supervisor—as two totally independent actors strains credulity.

¶ 73    Without the video, the officers were able to paint a virtually uncontested picture of this incident, which is presumably why the jury found in Dolton's favor on the willful and wanton claim. The jury was instructed that determining whether Lacey's conduct in pursuing Sorrells was willful and wanton required deciding whether he acted with "utter indifference to or conscious disregard for the safety of others." That was a fact-specific determination and if the jury had been able to view a real-time video of the final part of the chase, there is a reasonable probability they would have found in plaintiffs' favor on the willful and wanton claim. Accordingly, we hold that the jury's finding for plaintiffs on the spoliation claim was not against the manifest weight of the evidence and judgment *n.o.v.* was not warranted.

¶ 74                                    C. IPI 5.01

¶ 75    Dolton next argues that the trial court erred by giving IPI 5.01.[5] IPI 5.01 is often referred

to as the "missing evidence instruction" because it instructs the jury that, if a party fails to offer

evidence that is within that party's power to produce, the jury may infer that the evidence would

have been adverse to that party. *Simmons v. Garces*, 198 Ill. 2d 541, 573 (2002). IPI 5.01 is

warranted only if "there was no reasonable excuse for the failure to produce the evidence."

(Internal quotation marks omitted.) *Id.* As given in this case, IPI 5.01 read:

> "If the Village of Dolton has failed to offer evidence within its power to produce,
>
> namely dash cam video from Officer Ryan Perez's vehicle, you may infer that the dash
>
> cam video would be adverse to the Village of Dolton if you believe each of the following
>
> elements:
>
> 1. The dash cam video from Officer Perez's vehicle was under the control of the
>
> Village of Dolton and could have been produced by the exercise of reasonable diligence.
>
> 2. The dash cam video from Officer Perez's vehicle was not equally available to an
>
> adverse party.
>
> 3. A reasonably prudent person under the same or similar circumstances would have
>
> offered the dash cam from Officer Perez's vehicle if he believed it to be favorable to him.
>
> 4. No reasonable excuse for the failure has been shown."

---

[5]Dolton also makes a one-sentence claim that "the trial court improperly refused Dolton's Proposed Instruction *** that it was entitled to immunity under the Tort Immunity Act as to all claims." For some reason, this argument is buried among Dolton's arguments about its duty to preserve evidence. In any event, Dolton cites no authority in support of this contention and makes no substantive argument about it, so this argument is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 76    We review a trial court's decision to give a jury instruction for an abuse of discretion, which considers whether, taken as a whole, the instructions fairly and correctly stated the law and were sufficiently clear so as not to mislead the jury. *Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967, ¶ 56 (citing *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002)). The decision whether to give IPI 5.01 is within the sound discretion of the trial court.[6] See *Simmons*, 198 Ill. 2d at 573.

¶ 77    Dolton challenged the trial court's decision to give IPI 5.01 in both its posttrial motions. As noted above, we review the trial court's ruling on a motion for judgment *n.o.v. de novo. York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). In a motion for new trial, the trial court must determine whether the verdict is against the manifest weight of the evidence, and we review that determination for an abuse of discretion. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992).

¶ 78    Under any standard of review, we find no error in the trial court's decision to give IPI 5.01. As explained above, the evidence supported the conclusion that Perez's dashboard camera recorded video of the most important part of the chase, that the video was available to Dolton police, and that Dolton police either allowed the video to be deleted or did not produce it. Dolton's explanations for its non-production of the video shifted over the course of this case. Prior to trial, Dolton claimed that the video had been automatically deleted 16 hours after the incident. However, Dolton abandoned that theory at trial.[7] At his deposition, Lacey suggested that Perez's dashboard

---

[6]When the question is whether the jury instruction at issue accurately conveyed the applicable law, our standard of review is *de novo. Studt v. Sherman Health Systems*, 2011 IL 180182, ¶ 13. Dolton does not appear to contest that the version of IPI 5.01 given in this case correctly stated the law.

[7]Dolton's reply brief appears to resurrect this theory: "The limited discovery Plaintiffs conducted as to spoliation showed the pattern and practice of the department was that squad videos are automatically

camera did not record video because Perez did not log into the dashboard camera system. But at trial, Lacey testified that the dashboard camera recorded automatically without requiring a login. Ultimately, Dolton offered no explanation for the video's absence. In closing argument, Dolton's counsel appeared to acknowledge that Perez's dashboard camera video existed at one point but offered no explanation for what happened to it and expressly stated that he did not know what happened to Perez's dashboard camera video. These changing positions and ultimate lack of explanation supported the conclusion that Dolton had no excuse for the video's absence. Therefore, IPI 5.01 was warranted.

¶ 79     Dolton contends that the trial court erred by giving IPI 5.01 without a limiting instruction that the adverse inference applied only to the willful and wanton claim, not the spoliation claim. Dolton suggests the jury applied the adverse inference of IPI 5.01 to the spoliation claim and simply presumed that plaintiffs had prevailed on that claim without considering whether plaintiffs met their burden of proof. We are unconvinced. The jury received a separate instruction on plaintiffs' burden of proof and the elements of their spoliation claim. That instruction clearly stated that the jury had to find for Dolton if it concluded that plaintiffs did not carry their burden of proof on each element of spoliation. We presume that the jury followed the instructions and the record provides no basis to accept Dolton's theory. See *Moore v. Anchor Organization for Health Maintenance*, 284 Ill. App. 3d 874, 881 (1996) (absent any clear evidence to the contrary, we presume that the jury followed the court's instructions).

---

deleted after a mere 16 hours [record citation] well in advance of the time the preservation letter was issued."

¶ 80    In any event, Dolton has forfeited this argument. In the trial court, Dolton objected to giving IPI 5.01 and objected to the jury being instructed on the spoliation claim, but it never argued that giving both instructions would allow the jury to presume plaintiffs' victory on the spoliation claim. See *Greenwich Insurance Co v. RPS Products, Inc.*, 379 Ill. App. 3d 78, 85 (2008) (a party forfeits appellate review of arguments it did not raise in the trial court). More importantly, Dolton failed to propose the limiting instruction it now insists was necessary, further supporting our finding of forfeiture. See *Deal*, 127 Ill. 2d at 202-03.

¶ 81    Dolton also argues that IPI 5.01 caused inconsistent verdicts. We exercise all reasonable presumptions in favor of verdicts being consistent and will not find a verdict to be inconsistent if any reasonable hypothesis supports consistency. *McQueen v. Green*, 2022 IL 126666, ¶ 51. Dolton insists that the jury found that plaintiffs did not prove their willful and wanton claim *even with* the adverse inference acting as a substitute for Perez's missing video, but also found that Perez's dashboard camera video was necessary for plaintiffs to prove their willful and wanton claim, which is why the jury found for plaintiffs on spoliation. We do not know whether or how the jury applied IPI 5.01. The jury was instructed that it "*may* infer that the dash cam video would be adverse to the Village of Dolton." (Emphasis added.). It is possible the jury did not make that inference and simply decided they did not know enough about what happened during the chase to find for plaintiffs on the willful and wanton claim. Such a conclusion would be consistent with a spoliation verdict finding that Perez's dashboard camera video was the piece of evidence that would have allowed the jury to find in plaintiffs' favor on the spoliation claim.

¶ 82    Dolton's arguments on this issue stem from a misconception that IPI 5.01 created a *mandatory presumption* about Perez's dashboard camera video. It did not. The instruction merely

created a *permissible inference* that Perez's dashboard camera video would have been adverse to Dolton. A presumption and an inference are not the same thing. *State v. Funches*, 212 Ill. 2d 334, 340-41 (2004). An inference allows but does not require the factfinder to reach a certain conclusion. *Id.* By contrast, a presumption requires the fact finder to take a certain fact as established. *Id.* at 341. Our supreme court has declined, in spoliation cases, to "create an evidentiary *presumption*" that a defendant's loss of evidence automatically "deprived the plaintiffs of their lawsuit." (Emphasis added and internal quotation marks omitted.) *Boyd*, 166 Ill. 2d at 200. But in this case, the jury was not told to make such a presumption or any other presumption. *Boyd* does not prohibit giving IPI 5.01 in a spoliation case; in fact, it does not discuss IPI 5.01 at all. We have found no Illinois authority that prohibits giving IPI 5.01 simply because a case includes a spoliation claim among other claims. Accordingly, we affirm the trial court's decision to give IPI 5.01.

¶ 83                                   D. Plaintiff's Closing Argument

¶ 84     Dolton next contends that plaintiffs' closing argument was improper. In closing argument, attorneys have wide latitude to comment and argue based on the evidence and to draw reasonable inferences from that evidence. *Sikora v. Parikh*, 2018 IL App (1st) 172473, ¶ 60. However, attorneys cannot unfairly appeal to a jury's emotions because the jury must decide the case based on the evidence "unencumbered by appeals to its passion, prejudice or sympathy." (Internal quotation marks omitted.) *Id.* Allegedly improper comments must be viewed within the context of the entire closing argument. *Id.* We review issues concerning the prejudicial effect of potentially improper closing argument for an abuse of discretion. *Id.* ¶ 57 (citing *Simmons*, 198 Ill. 2d at 568).

¶ 85    Dolton claims that the following comments in plaintiffs' closing argument were improper:
Counsel's argument that "[w]e don't have to prove anything," counsel's statement that "Perez said
*** under oath, 'I had a dash cam,' " counsel's claim that Collins said, "I saw it and I preserved
it," and counsel's argument that

> "Lacey called in the—remember, he called in the chief; he called in the detectives. 'I just
> killed somebody. We have to get to the bottom of this.' The first thing he does is watch the
> dash cam video. It's really that simple. If it was good for him, we'd have it. I guess it wasn't
> good for him because we don't have it."

Dolton did not object to any of these comments during closing argument, so it has forfeited these
claims of error on appeal. See *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 14 (failure to
contemporaneously object to alleged error in closing argument forfeits issue for review).

¶ 86    Dolton also makes a generalized claim that "[p]laintiffs' counsel's improper argument was
designed to excite prejudice in the minds of the jury against his adversary" and that counsel made
"efforts to enflame the sympathies, passions and prejudices of the jury were effective, especially
in the context of the damages award of the Estate of John Kyles." Dolton does not identify what
comments were allegedly improper and has therefore forfeited this claim of error. See Ill. S. Ct. R.
341(h)(7) (eff. Oct. 1, 2020).

¶ 87    To be clear, we understand Dolton's claim of cumulative error. According to Dolton,
because the trial court did not instruct the jury that it could consider the adverse inference of IPI
5.01 only as to the willful and wanton claim, plaintiffs were able to argue that IPI 5.01 meant they
automatically won the spoliation claim. Dolton argued that the jury found for plaintiffs on the
spoliation claim but also found that plaintiffs could not prevail on the willful and wanton claim

even assuming that Perez's video was bad evidence for Dolton, which was an inconsistent verdict. However, we reject the building blocks of this argument for the reasons set out above, so we also reject Dolton's claim of cumulative error.

¶ 88                                    E. Special Interrogatory

¶ 89     Finally, Dolton argues that the trial court should have given a special interrogatory that Dolton proposed. That special interrogatory read: "Was Demetrius Sorrells'[s] conduct in driving under the influence of alcohol, driving without a valid license, exceeding the speed limit, disregarding traffic several traffic control devices, and failing to curb his vehicle the only proximate cause of the plaintiffs' injuries?"

¶ 90     Section 2-1108 of the Code of Civil Procedure (735 ILCS 5/2-1108 (West 2022)) provides that "[w]ithin the discretion of the court, the jury may be asked to find specially upon any material question or questions of fact submitted to the jury in writing." *Id.* Special interrogatories "shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions." *Id.* A special interrogatory must not be repetitive, confusing, or misleading. *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶ 30 (citing *Simmons*, 198 Ill. 2d at 563)). We review the trial court's denial of Dolton's special interrogatory for an abuse of discretion. *Id.* ¶ 27; 735 ILCS 5/2-1108 (West 2022). The court abuses its discretion if it "acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." (Internal quotation marks omitted.) *Cotton*, 2023 IL App (1st) 220788, ¶ 30 (quoting *Estate of Bass ex rel. Bass v. Katten*, 375 Ill. App. 3d 62, 67 (2007).

¶ 91    This argument pertains to the willful and wanton claim. Dolton prevailed on the willful and wanton claim without this special interrogatory, so we can safely assume that Dolton also would have prevailed with it. See *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 178-79 (2003). The absence of this special interrogatory made no difference to the outcome of the willful and wanton claim, so we see no prejudice to Dolton. See *id.* at 179. Moreover, Dolton fails to explain how the trial court's denial was arbitrary, exceeded the bounds of reason, or ignored recognized principles of law. *See Cotton*, 2023 IL App (1st) 220788, ¶ 30.

¶ 92    Even assuming that Dolton was somehow prejudiced by the absence of this special interrogatory, we find no abuse of discretion by the trial court. Dolton's special interrogatory essentially restated the element of proximate causation, which the willful and wanton claim elements instruction already included. We cannot see what this special interrogatory would have added to the jury's understanding of the law. If anything, the special interrogatory likely would have caused confusion about why the jury was being given two separate instructions on proximate causation on the same claim.  Accordingly, we affirm the trial court's decision to refuse Dolton's special interrogatory.

¶ 93                                    III. CONCLUSION

¶ 94    For the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

¶ 95    Affirmed.